## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **IN RE: AT&T INC. CUSTOMER DATA SECURITY BREACH LITIGATION** | Case No. 3:24-cv-00757-E |
| | MDL DOCKET No. 3:24-md- 03114-E |
| *This Document Relates to All Cases* | |

**OBJECTIONS OF MICHAEL VON LUNEN AND SUSAN BARROW TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

COME NOW, Objecting Class Members Michael Von Lunen and Susan Barrow (the "Objectors") and submit their objections to the Motion for Final Approval of Class Action Settlement filed by Plaintiffs in this action, and in support thereof state as follows:

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES .............................................................................................. iii

I.   INFORMATION ABOUT OBJECTORS REQUIRED BY CLASS ACTION NOTICE...... 1

II.  INTRODUCTION:............................................................................................................. 3

III. LEGAL STANDARD: ....................................................................................................... 6

IV.  ARGUMENT: ..................................................................................................................... 8

A.      The Settlement Fails Predominance ............................................................................ 9

1.   The Settlement Proponents Failed to Provide a Damage Model "Establishing that
     Damages are Capable of Measurement on a Class Wide Basis" ................................. 10

2.   Variations in State Law Defeat Predominance ............................................................ 13

B.      The Settlement is Unfair, Unreasonable and Inadequate, and Rule 23(e) Mandates and
Independent Judicial Review to Determine Whether the Record Affirmative Establishes that
the Settlement is "Fair, Adequate and Reasonable" to Absent Class Members ...................... 16

1.   AT&T Colluded with Plaintiffs and Conducted a Reverse Auction............................. 18

3.   The Proposed Settlement Relief is Inadequate ............................................................ 24

4.   The Releases Should Only Be Effective Against Class Members Whose Claims are Paid
     ...................................................................................................................................... 25

5.   The Cumbersome Claims Procedures and Opt-Out Requirements Made It More Likely
     that Consumers Would Not Claim Benefits or Opt-Out ............................................. 26

6.   The Releases are Impermissibly Broad......................................................................... 27

7.   The Releases Lack Consideration................................................................................. 29

8.   Plaintiffs and Their Counsel Put Their Interests Above the Interests of the Class....... 30

V.   CONCLUSION .................................................................................................................. 31

## TABLE OF AUTHORITIES

**CASES**

*Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062 (N.D. Cal. 2020) ........................................ 23

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) ...................................................... 10

*Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*, 624 F.3d. 185 (5th Cir. 2010) .... 12, 14

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)..................................................... 17

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)............................................................................ 10

*Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370 (5th Cir. 2016).................. 7

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).................................................................... 25

*Frego v. Settlement Class Counsel (In re Chinese-Manufactured Drywall Prods. Litig.),* 16 F.4th

    1181 (5th Cir. 2021) ............................................................................................................... 23

*Gene & Gene LLC v. BioPay LLC,* 541 F.3d 318 (5th Cir. 2008) .................................................. 7

*Grady v. RCM Techs, Inc.*, 671 F. Supp. 3d 1065 (C.D. Cal. 2023) ............................................ 21

*Hansberry v. Lee,* 311 U.S. 32 (1940).......................................................................................... 30

*In re Bluetooth Headsets Prods. Liability Litig.*, 654 F.3d 935 (9th Cir. 2011)........................... 16

*In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 307-308 (3d Cir. 2005) ...................................... 18

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................................... 6

*In re Ephedra Prods. Liab. Litig.*, 231 F.R.D. 167 (S.D.N.Y. 2005) ............................................. 8

*In re Vitamins Antitrust, Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ...................................................... 9

*Katrina Canal Breaches Litig. v. Bd. O Comm'rs*, 628 F.3d 185 (5th Cir. 2010)................... 23, 24

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012)................................................................... 16

*Litty v. Merrill Lynch & Co.*, 2015 WL 4698475 (C.D. Cal. 2015).............................................. 17

*O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003) ................................ 9

*Ortiz v. Fibreboard,* 527 U.S. 815 (1999) .................................................................................... 30

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) ................................................................ 30

*Ponzio v. Pinon*, 87 F.4th 487 (11th Cir. 2023) ........................................................................ 7

*Reynolds v. Ben. Nat'l Bank,* 288 F.3d 277 (7th Cir. 2002) ................................................. 18, 29

*Rodriguez v. West Publ'g Corp*., 563 F.3d 948 (9th Cir. 2009) ............................................. 21

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs. Inc*. 601 F.3d 1159 (11th Cir. 2010) ............................................................................................................................... 14

*Susman v. Lincoln American Corp.,* 561 F.2d 86 (7th Cir. 1977) ......................................... 30

*Tech. Training Assocs. v. Buccaneers Ltd. P'ship,* 874 F.3d 692 (11th Cir. 2017)........... 18, 19, 20

*Tech. Training Assocs. v. Buccaneers*, 2019 U.S.Dist. LEXIS 169334 (M.D. Fla. Sept. 30, 2019) ................................................................................................................................... 19

*Unger v. Amedisys Inc*., 401 F.3d 316 (5th Cir. 2005) ....................................................... 6

*Wilson v. J.B. Hunt Logistics, Inc*., 2020 U.S. Dist. LEXIS 259007 (C.D. Cal. Nov. 13, 2020 ... 21

**STATUTES**

11 TXBC 521.151 ............................................................................................................... 13

241 CTGS 13a-267 ............................................................................................................. 13

35 VC 59.1-442.................................................................................................................... 13

44 UTC 13-44-101, *et seq*.................................................................................................. 13

501 FLC 171 ........................................................................................................................ 13

61 IAC 2.14.......................................................................................................................... 13

815 ILCS 505/1, *et seq*................................................................................................... 13, 14

815 ILCS 530/1, *et seq*................................................................................................... 13, 14

CIV. 1798.3 .......................................................................................................................... 13

CRS 6-1-713.5 ..................................................................................................................... 13

IC 35-43-5-1.................................................................................................................. 13

MC 2-17-552.................................................................................................................. 13

ORS 192.377.................................................................................................................. 13

TC 47-18-2107............................................................................................................... 13

**RULES**

Fed. R. Civ. P. 23.................................................................................................. 7, 15, 30

**TREATISES**

4 Newberg and Rubenstein on Class Actions §13:60 (6th ed.)............................................. 18, 23

## I.    INFORMATION ABOUT OBJECTORS REQUIRED BY CLASS ACTION NOTICE

**A.    The objector's full name, mailing address, all AT&T telephone number(s), current telephone number; and for former AT&T customers all AT&T account number(s), and email address (if any) or an attestation that the former customer is unable to obtain their AT&T account number(s) or email address (if any)**;

1.    Michael Von Lunen
      820 S. Elmwood Ave
      Oak Park, IL 60304
      Prior Address: 2131 W. Cortez, #2, Chicago, IL 60622
      AT&T Phone No. None (Internet Only)
      Current Phone No. (331) 223-6031
      Email: mvonlunen@gmail.com
      AT&T 1 Settlement Class
      Class Member ID: 83231Q6D8H2XD

2.    Susan Dee Barrow
      1927 Twin Springs Dr.
      Kingwood, TX 77339
      Former AT&T No. and Current No. (713) 882-9508
      Email: barrowsusan13@yahoo.com
      AT&T 2 Settlement Class
      Class Member ID: 83231NJBNM29Z

**B.    All grounds for the objection, accompanied by any legal support for the objection known to the objector or objector's counsel**;

The Objector's grounds for objection and legal support are contained in this Objection and accompanying affidavit(s) or declaration(s).

**C.    The number of times the objector has objected to a class action settlement within the 5 years preceding the date that the objector files the objection, the caption of each case in which the objector has made such objection, and a copy of any orders related to or ruling upon the objector's prior objections that were issued by the trial and appellate courts in each listed case**;

1.    Michael Von Lunen – None.

2.    Susan Dee Barron – None.

**D.    The identity of all counsel who represent the objector, including (1) any former or current counsel who may be entitled to compensation for any reason related to the objection to the Settlement and/or Application for Attorneys' Fees, Costs, and Service Awards; (2) a description of the counsel's legal background and prior experience in connection with class action litigation; (3) a statement regarding whether fees to be sought will be calculated on the basis of a lodestar, contingency, or other method; (4) an estimate of the amount of fees to be sought; (5) the factual and legal justification for any fees to be sought; (6) the number of hours already spent by the counsel; and (7) an estimate of the hours to be spent in the future; and the attorney's hourly rate**.

Both Objectors are represented by Harrer Law, P.C. Seth McCormick is a partner at Harrer Law, P.C. His qualifications and legal background, and other requirements of this section are set forth in the Declaration of Seth McCormick filed contemporaneously with this Objection.

**E.    The number of times in which the objector's counsel and/or counsel's law firm have objected to a class action settlement within the five years preceding the date of the filed objection, the caption of each case in which counsel or the firm has made such objection and a copy of any orders related to or ruling upon counsel's or the counsel's law firm's prior objections that were issued by the trial and appellate courts in each listed case in which the objector's counsel and/or counsel's law firm have objected to a class action settlement within the preceding five years**;

1.   Harrer Law, P.C. – None.

2.   Seth McCormick – None.

**F.    The identity of all counsel (if any) representing the objector who will appear at the Final Approval Hearing**;

Seth McCormick

**G.    Four dates between the deadline for objections and a date two weeks before the Final Approval Hearing, during which the objector is available to be deposed by counsel for the Parties**;

Any proposed deposition can be set at a mutually agreeable time and date through consultation with Objectors' counsel. Tentatively, Objectors are available November 19, 2025; November 20, 2025, December 15, 2025 and December 16, 2025.

**H.    A list of all persons who will be called to testify at the Final Approval Hearing in support of the objection (if any)**;

Objectors have not yet determined who they will  call to testify at the Final Approval Hearing. Objectors will provide notice when such determination is made.

**I.    A statement confirming whether the objector intends to personally appear and/or testify at the Final Approval Hearing; and**

Objectors do not currently intend to personally appear and/or testify at the Final Approval Hearing, but may change that determination based on the conduct of the parties and the necessity of testimony to forward their objections.

**J.    The objector's signature (an attorney's signature is not sufficient)**.

See the signature block following this Objection.

## II.    INTRODUCTION:

As evidenced by the Kroll Affidavit, this Settlement is an unmitigated disaster. Indeed, at least 794,955 AT&T 2 Settlement Class Members **who filed Valid Claims** for Tier 3 Cash Payments will receive $0 in the settlement. Kroll does not disclose the breakout of Tier 1 and Tier 2 AT&T 1 Settlement Class Members who filed Valid Claims, so it is impossible to know how much, if anything, of the estimated $68,410,284.65 left for Tier 1 and Tier 2 AT&T 1 Settlement Class Members will receive after administrative costs, exorbitant attorneys' fees, service awards, Documented Loss Payments, and taxes.[1]

The $42,727,382.50 in Documented Loss Payments claimed by AT&T 2 Settlement Class Members juxtaposed by the $28,000,000 settlement payment for the AT&T 2 Settlement Class (before being diluted by 43% vis-à-vis the administrative costs, attorneys' fees and  service awards) alone demonstrates the inadequacy of the settlement and Class Counsel who did not investigate their clients' claims, perform due diligence, or negotiate a deal that made any economic sense to the Class. The fact that nearly 1 million AT&T 2 Settlement Class Members who actually filed

---

[1] The remaining 91 million AT&T customers affected by the Data Breaches will receive nothing.

claims will get $0 is absurd. The failures of Class Counsel to secure a settlement that would be even remotely just demonstrates their inadequacy without much additional evidence necessary.

But there is additional evidence: both circumstantial and direct evidence demonstrate that this settlement was reached through collusion. Indeed, AT&T knew it had a complete defense to the class claims in the form of the airtight class waiver and mandatory arbitration provision contained in its Terms and Conditions. AT&T also knew that with 79 million consumers affected by AT&T 1 Data Breach and 109 million customers affected by the AT&T 2 Data Breach, and the sensitivity of the information accessed, potential arbitration claims could be in the tens, if not hundreds, of thousands. Consequently, AT&T bided its time, allowed the MDL to form, and monitored the "solicitation activity" of known plaintiff's firms who were engaging clients to file individual arbitration claims. When it became clear that the administrative fees associated with mounting individual arbitration claims would become more expensive than a class settlement, AT&T decided a class settlement would be more economically advantageous. AT&T then settled this case with the Plaintiffs at gun point offering *plato o plomo* (silver or lead). Class Counsel could either accept a deal that grossly undervalued the class claims and receive a handsome attorneys' fee award, or face a motion to compel arbitration.

Once AT&T decided that it was in its best economic interest to reach a class settlement, AT&T commenced a "dog and pony show" of a mediation with an ineffective mediator and invited Class Counsel and all of the arbitration claimants' attorneys. AT&T then proceeded to cancel the first day and half of the three-day mediation for the arbitration claimants and only negotiated this settlement with Class Counsel. After settling with the class, which settlement created unprecedented and unnecessary hurdles for arbitration claimants to opt-out, AT&T offered the arbitration claimants many multiples (for some Tiers more than █ times) what its stated target was

for the separate Tiers here, while at the same time leveraging the onerous "wet ink" opt-out and objection requirements contained in the Settlement forecasting, fully expecting that the arbitration claimant's attorneys would not incur the cost and expense of complying with the opt-out requirements.

Though the arbitration settlements are still undervalued, the settlements AT&T offered arbitration claimants' counsel far exceed the amounts AT&T negotiated to pay to the Class. When those efforts failed, AT&T offered to sweeten the pot to the arbitration claimant's attorneys by offering ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███. In doing so, AT&T limited the risk of having to arbitrate those claims, which due to the administrative costs alone would have eclipsed the combined settlement payment here.

This is the type of settlement that courts and commentators frequently warn about. It promises large attorneys' fees to Class Counsel but will provide very little to the Class. Most class members – even the class members who filed Valid Claims – will receive nothing. Yet, AT&T and the Released Parties – who unquestionably made hundreds of millions of dollars from the Class Members – will be absolved from liability if the Court approves this proposed Settlement. The Court should not do so on this limited record.

The Parties do a lot of hand waiving around other settlements and repeating the refrain that this settlement is fair and equitable but have offered no proof. The Parties hope that this Court will blindly approve the settlement and fee request without meeting the requirements of Rule 23 or the *Reed* Factors. The Parties have not submitted a damage model to support their predominance argument. The Parties have not submitted an opinion letter from Robert Meyer – the Puppet Mediator – who did no such thing. The Parties have not explained why they created such barriers

for opt-outs or objectors. The Parties have not explained why there are parties receiving releases without providing any form of consideration for those releases. The Parties have not explained what work they did for $60 million in attorneys' fees for a case that settled pre-answer, pre-discovery, and demonstratively before Class Counsel had done any actual investigation.

Until the parties come forward with proof demonstrating the adequacy and fairness of the Settlement, the requested attorneys' fees, or explain the ruse of a reverse auction, the Court should deny the Motion.

## III.    LEGAL STANDARD:

A class action settlement requires court approval, Fed. R. Civ. P. 23(e), "to protect the rights of the many absent class members who were not involved in the negotiations leading to settlement," *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir. 1981). This Court must exercise "careful scrutiny" in its "role as a fiduciary serving as a guardian" of the rights of absent class members.; *see also United States v. Miami,* 614 F.2d 1322, 1331 (5th Cir. 1980) Indeed, "[w]here, as here, a settlement is negotiated prior to formal class certification," the "agreement[] must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Drazen v. Pinto*, 106 F.4th 1302, 1328 (11th Cir. 2024) (cleaned up) (cleaned up) (collecting cases). This is because there is a "greater potential for a breach of fiduciary duty owed the class" in such circumstances. *Id.*

In fulfilling its roles as a guardian and fiduciary of the Class, this Court must make two findings: (1) "that it will likely be able to approve the proposal [the settlement] under Rule 23(e)(2)" and (2) that "it will likely be able to … certify the class for purposes of judgment on the proposal." *Drazen*, 106 F.4th at 1328 (cleaned up); *see also Amchem Prods. v. Windsor*, 521 U.S.

591, 621 (1997) Plaintiffs "bear the burden" of demonstrating that approval should be given. *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). For the first inquiry, the Court must consider whether the settlement is "fair, reasonable and adequate" under Rule 23(e)(2). *Amchem,* 521 U.S. at 607; *Miami*, 614 F.2d at 1330. Rule 23(e)(2) requires the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, …; and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *accord Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 375 (5th Cir. 2016); *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 293 (5th Cir. 2017).

Appellate Courts have described these as the "core concerns" of Rule 23(e) and the "primary considerations in evaluating proposed agreements." *Ponzio v. Pinon*, 87 F.4th 487, 495 (11th Cir. 2023) (cleaned up). But the Fifth Circuit has also prescribed a six-factor test "the *Reed* factors" to complement the core concerns, and instructed courts to continue to apply the *Reed* factors. "to determine the appropriateness of a proposed settlement." *Jones,* 865 F.3d 293. The *Reed* factors are: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members. *Reed v. Gen. Motors Corp.*, 703 F.2d 170. 172 (5th Cir. 1983).

As for the second inquiry, class certification is proper only when the proposed class satifies "Rule 23(a)'s four threshold requirements (numerosity, commonality, typicality, and adequacy of representation), as well as the requirements of Rule 23(b)(1), (2) or (3)" *Gene & Gene LLC v.*

*BioPay LLC,* 541 F.3d 318, 325 (5th Cir. 2008). "[P]roposed settlement classes sometimes warrant more, not less, caution on the question of certification." *In re Ephedra Prods. Liab. Litig.*, 231 F.R.D. 167, 170 (S.D.N.Y. 2005) (quoting *Amchem*, 521 U.S. at 620 n.16). Though settlement may moot trial-management issues, the "other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id*.

## IV.    ARGUMENT:

The Court should decline to certify the class or give final approval of the settlement for three main reasons: *First*, individual issues, not common issues, predominate the Classes, including that certification of a nationwide class of AT&T customers who were victims of AT&T's failure to protect the consumer's PPI and subsequent delay in notifying the consumers of the breach, without appropriately separating the Class(es) into sub-classes, fails to recognize the wildly disparate state law claims held by the consumers, which are specifically related to the handling and disclosure requirements in data breaches. These state statutes have different definitions of PII, classify levels of PII separately, have different mechanisms for enforcement, and differ in the damages that a consumer may recover when a company, such as AT&T, violates the statute. Plaintiffs' failure to recognize or address this in structuring the settlement, renders the settlement inferior to other available methods for the fair and efficient adjudication of consumer's claims. Plaintiffs have also failed to offer a damages model adequate to support its class treatment and have failed to establish that damages are capable of measurement on a class-wide basis.

*Second*, the settlement is unfair, unreasonable, and inadequate under Rule 23(e)(2), particularly because the settlement (a) resulted from an improper reverse auction, (b) the relief is inadequate, (c) the releases are impermissible broad, (d) certain released parties are providing no

consideration for the releases they are set to receive, and (e) Plaintiffs and their counsel have failed to adequately represent the Class(es). Finally, the settlement cannot be approved because, according to Plaintiffs and AT&T, the Snowflake claimants lack Article III standing.

### A.    The Settlement Fails Predominance

Critical to the Court's duty to scrutinize class certification is Rule 23(b)(3)'s predominance requirement. The predominance requirement is two-fold.

> Before certifying a class under Rule 23(b)(3), a court must determine that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

*Madison v. Chalmette Ref., L.L.C.*, 637 F3d 551, 555 (5th Cir. 2011). Evaluating predominance requires a court to "inquire how the case will be tried." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003). The question is what substantive issues will control the outcome, which issues will predominate, and whether those issues are common. *Id*. In general, predominance requires "generalized evidence which proves or disproves an element on a simultaneous class-wide basis" and which "obviates the need to examine each class members' individual position. *In re Vitamins Antitrust, Litig*., 209 F.R.D. 251, 262 (D.D.C. 2002).

Here, there may be common questions of fact in that AT&T consumers' data was compromised. However, that is where the commonality ends, and the Plaintiffs do not address the issues of law that unravel this commonality, or address the second prong of the predominance test. Plaintiffs failure to address superiority is a thinly veiled attempt to avoid crucial discussion regarding the disparate treatment of damages under state law across the country, the insufficiency of proposed settlement funds to each class, and their attempt to secure a wholly prejudicial and insufficient settlement to force absent members to be silenced while handsomely rewarding pliant attorneys who sold out their clients in exchange for a hefty fee. The Fifth Circuit emphasized that

crucial to the determination of predominance is the requirement that "district courts . . . consider 'how a trial on the merits would be conducted if a class were certified." *Madison*, 637 F.3d at 555. Furthermore, the Fifth Circuit has been quick to overturn the lower courts' decisions where they "fail[ed] to afford [their] predominance determination the 'rigorous analysis' that Rule 23 requires." *Id.* at 556.

### 1. The Settlement Proponents Failed to Provide a Damage Model "Establishing that Damages are Capable of Measurement on a Class Wide Basis"

Even if Plaintiffs can overcome the hurdle posed by the variations in state law that, as discussed below defeat predominance, and demonstrate that common issues predominate on questions of liability, Plaintiffs have failed to support the proposed settlement with a damage model. Failure to submit a damage model in support of confirmation of the classes and final approval of the settlement is fatal to the proposed settlement.

The Fifth Circuit requires that "[e]ven where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a classwide basis.'" *Cruson v. Jackson Nat'l Life Ins. Co*., 954 F.3d 240, 258 (5th Cir. 2020) (*quoting Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). "The issue of damages may defeat predominance 'where the calculation of damages is not susceptible to a mathematical or formulaic calculation.'" *Id*. (quoting *Bell Atl. Corp. v. AT&T Corp*., 339 F.3d 294, 307 (5th Cir. 2003).

Here, Plaintiffs submit no damage model, and even though Class Counsel claims to have "engaged experts," they have not identified or offered an affidavit from an expert to support their proposed treatment of the classes. Plaintiffs separate the Classes into Tiers – offering a Documented Loss Cash Payment, a Tier 1 Cash Payment (for AT&T 1 Class Members whose SSNs were accessed, which payment shall be five times payments from lower tiers), a Tier 2 Cash

10

Payment (for AT&T 1 Class Members whose SSNs were not accessed), and Tier 3 Cash Payments (for AT&T 2 Settlement Class Members who had information involved in the AT&T 2 Data Incident). Class Action Settlement Agreement and Release at ¶¶ 30, 34, 37, 43, 50, 53, 68, 111-16. For the Documented Loss Cash Payments, AT&T 1 Class Members can receive "up to" $5,000 in documented losses so long as the total amount of AT&T 1 Data Breach Documented Loss claims do not exceed $25 million, in which case the AT&T Class Members Documented Loss Cash Payments will be distributed *pro rata* of the $25 million. AT&T 2 Data Breach Documented Loss Cash Payments are capped at $2,500 per class member, but there is no cap on the total amount of AT&T 2 Data Breach Documented Loss payment claims.

Plaintiffs do not explain this complicated structure except to explain that the Tiered Cash Payments "are structured so as to provide greater relief for those Settlement Class Members who had more sensitive personal information exposes in the Data" Breaches. Motion, p. 32. This theory is unsupported by any evidence, any model, or any expert opinion. The theory is also belied by the $42,772,382.50 of Documented Loss claims already submitted by AT&T 2 Data Breach Class Members who are to share $28,000,000 (less $2.8 million administrative costs, $9.3 million in attorneys' fees, $10,500 in Service Awards). The massive number of Documented Loss claims for AT&T 2 Data Breach Claims entirely depletes the pool of money allocated for Tier 3 – meaning that the ***794,955 Class Members who submitted Valid Claims for a Tier 3 Cash Payment will receive $0,*** and the Class Members submitting Documented Loss Cash Payment claims for AT&T 2 Data Breach Incident will have received approximately 1/3 of their documented Claims after the administrative costs eat up 43% of the $28,000,000 settlement.

[see chart on following page]

| AT&T 2 Class Members | | |
|---|---:|---|
| Total Class Members | 36,478,631 | Motion, p. 9 |
| Participating Class Members | 808,927 | Kroll Aff, ¶25 |
| Documented Loss Claims | 17,926 | Kroll Aff, ¶26 |
| Tier 3 Cash Claims | 794,955 | Kroll Aff, ¶26 |

| AT&T Class Settlement | | |
|---|---:|---|
| Payment | $28,000,000.00 | SA, ¶52 |
| Administrative Costs | ($2,800,000.00) | Kroll Aff, ¶30 |
| Attorneys' Fees | ($9,333,333.33) | Fee Aff, ¶9 |
| Service Awards | ($10,500.00) | SA, ¶179 |
| Documented Loss Pmt. | ($42,772,382.50) | Kroll Aff, ¶26 |
| Taxes | $0.00 | Assumed |
| Total: | ($26,916,215.83) | |

Plaintiff's theory that the exposure of "more sensitive personal information" creates an entitlement to "five times" the damages of any other class member is not borne out in the evidence, and is not supported by any expert opinion. Plaintiffs have failed to provide the "relevant mathematical calculations appropriately applied," and have not even offered the "preliminary overview of how [these] damages might be calculated," which the Fifth Circuit found insufficient for class certification and settlement approval in *Cruson*. *Cruson v. Jackson Nat'l Life Ins. Co*., 954 F.3d at 258-259. Plaintiffs' failure to support the class treatment with a damage model or an expert report – especially when its proposed treatment has *in reality* devastated the recoveries for the class apparently most harmed – renders the settlement unapprovable, and the Motion must be denied.

## 2. Variations in State Law Defeat Predominance

Not only have Plaintiffs failed to support class treatment with a damage model, Plaintiffs also failed to address at all how variations in state law might affect predominance; and the Court cannot certify a class or approve a nationwide settlement involving multiple jurisdictions where consideration of "variations in state law" have not been addressed. Plaintiffs failed to carry their burden to prove that variations in state law do not preclude certification. *See Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*, 624 F.3d. 185, 195 (5th Cir. 2010).

"A district court's duty to determine whether the plaintiff has borne its burden on class certification requires that a court consider variations in state law when a class action involves multiple jurisdictions." *Castano v. Am. Tobacco Co*. 84 F.3d 734, 741 (5th Cir. 1996), The failure to consider how variations in state law affect predominance and superiority "mandates reversal." *Id*.

In seeking provisional certification for purposes of settlement, Plaintiffs do not even acknowledge that certifying a nationwide class requires considering variations in state law. They do not survey state law claims or state law principles, and the Plaintiffs provide no information to the District Court concerning state variations. These variations are particularly important here, where – although they are cagey about it – AT&T took the position that no PII was exposed in the AT&T 2 Data Incident and Class Counsel have been hand waiving around those damages ever since.

Variations in state law, however, could have strengthened that litigation position if Class Counsel weren't so busy negotiating $9 million in attorneys' fees that they forgot to investigate their clients' claims. Specifically, at least 13 states have adopted discrete and comprehensive data privacy laws, including: Illinois (815 ILCS 530/1 *et seq*.), Texas (11 TXBC 521.151), California

(CIV. 1798.3), Virginia (35 VC 59.1-442) , Colorado (CRS 6-1-713.5), Connecticut (241 CTGS 13a-267), Utah (44 UTC 13-44-101 *et seq*.), Iowa (61 IAC 2.14), Indiana (IC 35-43-5-1), Tennessee (TC 47-18-2107), Montana (MC 2-17-552), Florida (501 FLC 171), and Oregon (ORS 192.377). Each state's act has differing enforcement mechanisms, separate standards of the definition of PII, and varying levels of PII, separate liability standards, and separate  relief, including damages awardable for a corporation's violation of the state act.

To highlight these differences, a comparison of the Illinois Personal Information Protection Act, 815 ILCS 530/1 *et seq.* ("IL PIPA") and the Texas Identity Theft Enforcement and Protection Act ("TITEPA") demonstrates the variable features applicable to this case. For example, a violation under TITEPA can only be enforced by the Texas Attorney General, who may levy civil penalties of ranging from $2,000 to $50,000 per violation and seek injunctive relief. Tex. Bus. & Com. Code Ann. § 521.151 (West 2025). There is no private right of action afforced to consumers for violations of the TITEPA or "any other law."

In sharp contrast, under IL PIPA, the primary enforcement mechanism is a private right of action under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. ("ICFA"). *See*, 815 ILCS 530/2 ("A violation of [IL PIPA] constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act"). IL PIPA is strict liability, contingent only on damages, and under ICFA, a consumer is entitled to recover actual damages and attorneys' fees, and punitive damages are also available under certain circumstances. *See*, 815 ILCS 505/10a.

The two state statutes differ in other ways as well. For example, TITEPA differentiates between "Personal identifying information" and "Sensitive personal information," while IL PIPA broadly defines all protected information as "Personal information," and includes "user name or

14

email address, in combination with a password or security question and answer that would permit access to an online account," which concept is not included in TITEPA.

Plaintiffs fail to provide any serious consideration of any variations in state law applicable to these statutes. *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs. Inc.* 601 F.3d 1159, 1180-83 (11th Cir. 2010) (noting significant state variations in the law of waiver in reversing class certification). Plaintiffs have the responsibility to demonstrate that state law variations do not preclude the certification of a nationwide class. *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*, 624 F.3d. at 195.[2]

Adjudicating the variations in state law and the effect those laws have on the information accessed as compared to the definitions provided in the state statute, whether a private right of action exists, the liability standard, and the damages allowed require a complicated series of individual mini-trials under varying state laws. At a minimum, the variation in state laws will have a material effect on the appropriate Tier classification that Plaintiffs have simply lumped into three buckets based on their perceived sensitivity without support. The Documented Loss claims from Tier 3 demonstrate the fallacy of that logic, and Plaintiffs' failure to consider the manner in which variations in state law impact predominance requires denial of the provisional certification of the class and approval of the settlement.

---

[2] Plaintiffs may argue that they didn't bring statutory claims, but that argument is unavailing as named plaintiffs live in states where these claims are available and should have been brought. Compl., ¶¶ 17-60. Moreover, pursuant to the extraordinarily broad Releases, the Class Members release these claims whether Plaintiffs asserted them or not. Settlement Agreement,¶¶ 49-52.

**B.     The Settlement is Unfair, Unreasonable and Inadequate, and Rule 23(e) Mandates and Independent Judicial Review to Determine Whether the Record Affirmative Establishes that the Settlement is "Fair, Adequate and Reasonable" to Absent Class Members**

Under Rule 23, the Court may approve a class action settlement "only after a hearing and on finding that the settlement... is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(c). Under this standard, the bottom line consideration is "whether the interests of the class are better served by the settlement than by further litigation." Complex Litig. Manual (Fourth) § 21.61.

In conducting this inquiry, the court must be cognizant that there is "typically not [a] client with the motivation, knowledge, and resources to protect its own interests." *Id*. As a result, "the judge must adopt the role of a skeptical client" by "critically examin[ing] the class certification elements, the proposed settlement terms, and procedures for implementation." *Id*. Judicial scrutiny must be applied all the more vigorously where settlement is attempted before an adversarial class certification motion. At this stage "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *In re Bluetooth Headsets Prods. Liability Litig*., 654 F.3d 935, 946 (9th Cir. 2011). Thus, when "the settlement takes place before formal class certification, settlement approval requires a higher standard of fairness." *Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012); *see also Amchem,* 521 U.S. at 620 and *Miami*, 614 F.2d at 1331.

Further "Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important." Complex Litig. Manual (Fourth) § 21.612 (2004). Such "settlement class actions" require "closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process." *Id*. Moreover, there are "a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements." *Id*. They include, among other things, conducting a "reverse auction," in which a defendant, seeing competing class

cases, cherry-picks the attorneys willing to accept the lowest class recovery, in exchange for enhanced fees; the voluntary dismissal of class claims for "strategic purposes," such as forum shopping or to obtain more favorable settlement terms; cumbersome claims procedures that make it likely that many members will not claim benefits, particularly if the settlement provides that the unclaimed portions of the fund will revert to the defendants; and releasing claims against parties who did not contribute to the class settlement. *Id*. (describing a "reverse auction" settlement as one in which a defendant seeks to settle with counsel willing to accept the lowest offer); *Cullan & Cullan v. M-Qube, Inc.,* 2014 U.S. Dist. LEXIS 11524, *24-25 (D. Neb. Jan. 30, 2014).

Indeed, unfair "sweetheart deals" are most likely where, as here, the Defendant is attempting to use the settlement with one plaintiff as a vehicle to release the claims pending in other actions. Under the circumstances, if the plaintiff agrees to a broad release despite a "weak negotiating position" and lack of discovery, and the Defendant agrees to not oppose a substantial attorney fee in award in return, the court may properly draw a strong circumstantial inference that the resulting settlement is unfair and inadequate for the absent class members. *Litty v. Merrill Lynch & Co.*, 2015 WL 4698475, *10 (C.D. Cal. 2015).

A further mandatory safeguard requires the court to determine that the proposed settlement class actually meets each of the requirements for class certification under Rule 23. And, the "[t]he proposed settlement cannot be judged without reference to the strength of plaintiffs' claims" and that "the most important factor is the strength of the case for plaintiff on the merits, balanced against the amount offered in settlement." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974).

Here, as discussed below, all of the hallmarks of an unfair settlement are present. This Court cannot approve a settlement where the sufficiency of the consideration is unsupported or

supported by vague assurances that counsel and the class representatives believe the value of the settlement outweighs the potential risks of litigation, and there is both circumstantial evidence of collusion and actual evidence of AT&T conducting a "reverse auction."

### 1. AT&T Colluded with Plaintiffs and Conducted a Reverse Auction

Faced with hundreds of thousands of individual arbitrations, AT&T conducted a "reverse auction" to drive down its potential liability from the estimated 250,000 individual claimants who had already hired attorneys to pursue those individual arbitrations on their behalf.

Any reverse auction class action settlement requires heightened scrutiny. A "reverse auction" occurs when a defendant, seeing competing proceedings, cherry-picks the attorneys willing to accept the lowest class recovery in exchange for enhanced fees. See Complex Litig. Manual, § 21.61 and 21.71 (describing a "reverse auction" settlement as one in which a defendant seeks to settle with counsel willing to accept the lowest offer); *see also Cullan & Cullan v. M-Qube, Inc*., 2014 U.S. Dist. LEXIS 11524, *24-25 (D. Neb. Jan. 30, 2014). "The problem in the reverse auction situation is that the class' interests have been sold out, and class members get less than the full value of their claims." 4 Newberg and Rubenstein on Class Actions §13:60 (6th ed.). Factors that raise suspicions include a quick settlement with "a plaintiff with weaker claims and weaker counsel in an effort to negotiate a more favorable settlement" and class counsel that "underbids… in an  effort to collect attorney's fees." *Tech. Training Assocs. v. Buccaneers Ltd. P'ship,* 874 F.3d 692, 695-697 (11th Cir. 2017). The circumstances here reek of an improper reverse auction, and there is direct and circumstantial evidence to support a finding of a reverse auction.

Settlements that result from reverse auctions do not satisfy the requirements of Rule 23(e). *E.g., In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 307-308, 318 (3d Cir. 2005) (reversing approval of a proposed settlement where the settlement had indicia of a "reverse auction," including (i) "no

formal discovery" and (ii) the release of claims beyond those at issue in the case); *Reynolds v. Ben. Nat'l Bank,* 288 F.3d 277, 283-85 (7th Cir. 2002) (reversing approval of a settlement because the district court failed to assess whether the proposed settlement was "actually collusive in the reverse-auction sense").

In *Buccaneers*, the plaintiffs (Technology Training Associates and Back to Basics Family Chiropractic) sued the defendant under the Telephone Consumer Protection Act (the "TCPA") after they received unsolicited faxes offering Tampa Bay Buccaneers tickets. *Tech. Training Assocs. v. Buccaneers Ltd. P'ship,* 874 F.3d at 695. The Technology Training plaintiffs filed their suit after the statute of limitations for a TCPA claim expired. *Id*. Shortly after filing suit, the parties filed their motion for preliminary approval. *Id*.

A different plaintiff (Cin-Q Automobiles) had already filed a nearly identical lawsuit against Bucanneers over the same faxes and filed within the statute of limitations period. *Id*. After the preliminary approval motion was filed in the Technology Training case, the Cin-Q court stayed consideration of Cin-Q's class certification motion and the Cin-Q plaintiffs attempted to intervene in the Technology Training matter arguing that the settlement was inadequate and the result of a reverse auction. The District Court denied the motion to intervene, and Cin-Q appealed. *Id*.

Upon review, the Eleventh Circuit reversed, holding that the Technology Training "plaintiffs have a greater incentive to settle because their claims may be barred by the statute of limitations… while the movants have no statute of limitations issue." *Id*. More broadly, the appellate court found that "plaintiffs' counsel… deliberately underbid the movants in an effort to collect attorney's fees" and if plaintiff's counsel was "indeed motivated by a desire to grab attorneys' fees instead of a desire to secure the best settlement possible for the class, it violated its ethical duty to the class." *Id*. Finally, the court observed that "it is plain from the record that during

the negotiations the interests of named plaintiffs and of [plaintiff's attorneys] were aligned with those of Bucaneers and adverse to the" Cin-Q plaintiffs' interests. *Id*. at 697-98.

On remand, the Cin-Q plaintiffs were permitted to intervene. They promptly moved to decertify the class, and the district court granted the motion based on the "reverse auction" conducted by the Technology Training plaintiffs. *Tech. Training Assocs. v. Buccaneers*, 2019 U.S.Dist. LEXIS 169334, *63-64 (M.D. Fla. Sept. 30, 2019).

This case is on all fours with *Buccaneers*. The only difference lies in the facts of the "weaker claim" discussed by the Eleventh Circuit. In *Buccaneers*, the weaker claim was the statute of limitations defense, and, here, the weaker claim is the class action waiver and mandatory - individual arbitration provision. *Tech. Training Assocs. v. Buccaneers Ltd. P'ship,* 874 F.3d at 697-98. Both weaknesses lead to the same result – dismissal of the class action claim. AT&T and Class Counsel knew this. So, they conspired to settle this matter for a fraction of the value of the claims to the Class Members. As a condition to the settlement, AT&T demanded that Class Counsel include onerous opt-out, objection, and claims submission provisions and agreed to fork out $60 million in attorneys' fees for the favor. The "wet ink" opt-out provisions were designed to discourage actual opt-outs, and the objection and claims provisions were designed to discourage any participation by Class Members.[3]

Once the deal was struck, AT&T turned around and offered all of the 250,000+ arbitration claimants many multiples of the amount intended for the class settlement. Indeed, at the mediation AT&T's counsel stated that it had settled with the class for the following amounts: ▮ for

---

[3] Plaintiffs and AT&T may argue that the Objectors' view of the Settlement is skewed and that the Objectors' attorney is striking out because the arbitration claimants were out maneuvered. This is simply not true. As the Eleventh Circuit observed: Attorneys who earlier rejected poor settlements based on the same claims should file objections if the settlement is indeed objectionable—not because of "sour grapes" but because the settlement is, in fact, inadequate and unfair. *See, e.g., Tech. Training Assoc., Inc. v. Buccaneers L.P.*, 874 F.3d 692, 694 (11th Cir. 2017).

customers whose SSN was accessed in the AT&T 1 Data Breach (Tier 1); ███ for customers whose PIII (but not their SSN) was accessed in the AT&T I Data Breach (Tier 2); and "less than ███" for customers who were affected by Snowflake (Tier 3).[4] *Id.*, ¶31. After the deal with the class was secure, AT&T offered ███ for Tier 1; ███ for Tier 2; and ███ for Tier 3. The offer was take it or leave it and AT&T insisted that "We are not deviating from these terms." *Id.*, ¶35.

AT&T thus knew that the true value of the claims was at least: ███ times the amount it agreed to pay the Class for Tier 1; ███ times the amount it agreed to pay the Class for Tier 2; and ███ times the amount it agreed to pay the Class for Tier 3. *Id.*, ¶36. After the mediation concluded without a sufficient number of arbitration claimants agreeing to the deal, AT&T followed up and agreed to (a) ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████" *Id.*, ¶42-43. AT&T thus appealed to attorney greed – just as it had done with Class Counsel.

Plaintiffs may argue that used a mediator to settle the class and arbitration claims. As set forth in the McCormick Declaration, Robert Meyer, the mediator, did no mediating at all. ¶¶27-44. Instead, he followed AT&T's counsel around the halls of JAMS echoing AT&T's counsel's puffing and refusing to engage in any form of discussion. He was more of herder of cats than a *bona fide* mediator. *Id.* Despite the ruse of a mediation, "[a]n experienced and impartial mediator's supervision is not a guarantee of settlement fairness and adequacy." *Grady v. RCM Techs, Inc.*, 671

---

[4] Submitted concurrently herewith is the Declaration of Seth McCormick (the "McCormick Declaration"). Mr. McCormick attended the "mediation" and testifies regarding the events leading up to and the mediation and the settlement offers made to Harrer Law's clients at the mediation, which settlement offers far exceeded that amounts offered to all of the Class Members here. The Objectors are also filing a motion for in camera inspection by the Court to review the details of the settlement discussions between AT&T and the arbitration claimants at the mediation and after. The in camera motion is necessary due to the confidentiality provisions in the agreement to mediate.

F. Supp. 3d 1065, 1077 (C.D. Cal. 2023); *see also, Wilson v. J.B. Hunt Logistics, Inc.*, 2020 U.S. Dist. LEXIS 259007, *6 (C.D. Cal. Nov. 13, 2020 ("While courts often look to participation in mediation as evidence that negotiations were non-collusive, a mediated settlement is not guaranteed to serve the best interests of class members") (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)). This is one of those cases.

AT&T capitalized on the weak litigating position of the Plaintiffs and the prospect of Class Counsel not receiving fees to leverage a "sweetheart" settlement with Plaintiffs and their counsel. AT&T then leveraged the arbitration claimants by including ridiculous opt-out provisions in the Settlement stating "the class has negotiated 'no exclusion' for claimant's asserting arbitration, and a wet signature opt-out requirement for both classes" and stating "we are confident these terms will be confirmed." *Id.*, ¶33. After gaining leverage on the arbitration claimants, AT&T offered each arbitration claimant amounts that eclipsed in all respects the amount any Class Member might receive, and offered to add attorneys' fees on top. *Id.*, ¶¶42-43. AT&T colluded to leverage weak negotiating positions of the class to protect itself, and Plaintiffs and Class Counsel permitted it. In fact, they embraced it.[5]

All of the other hallmarks of a reverse auction are present. The Settlement occurred prior to any litigation or discovery taking place. The Settlement occurred prior to the parties truly understanding the strength or weaknesses of the plaintiff's claims, and the risk posed to the defendant. Class Counsel boast that they "hired experts" and "interviewed hundreds of claimants." This representation is not borne in the evidence. Class Counsel did not present any expert report in support of its class treatment, and did not prepare a damages model. It also apparently interview

---

[5] Further circumstantial evidence of this collusion and AT&T's requirement that the Settlement be economically advantageous to AT&T is the "secret" blow up provision that provides for AT&T to withdraw from the settlement if an undisclosed number of customers Opt-Out. Settlement Agreement at 52, ¶190.

enough claimants to understand that the Documented Loss Cash Payments claims for Tier 3 would double the amount of of the settlement  for Tier 3 claims, and that more than a million Class Members would file claims and receive $0.

Class Counsel also boasts that it did "informal" and "confirmatory" discovery with AT&T, but it is more likely that AT&T sold them a bill of goods and Class Counsel didn't even kick the tires. Class Counsel knew that if it didn't get in line, its $60 million would go up in smoke. The result of the collusion between Plaintiffs, Plaintiffs' Counsel and AT&T resulted in a Settlement that is inadequate, unfair and unreasonable. The Court should permit the Objectors to conduct discovery into the collusion if the Court is not satisfied by the evidence presented in the McCormick Declaration to determine the scope of the collusion. In the alternative, the Court should reject the settlement as unfair. *See Frego v. Settlement Class Counsel (In re Chinese-Manufactured Drywall Prods. Litig.),* 16 F.4th 1181, 1185-86 (5th Cir. 2021)*.*

## 2. The Settlement Contained an Unlawful Injunction Against Parallel Proceedings

Based on incomplete and deceptive information provided by Class Counsel and AT&T Counsel, this Court issued the preliminary approval order containing an extraordinary injunction that bars Class Members from "asserting any claims or initiating or continuing in any litigation or arbitration against AT&T and/or the Released Parties arising out of, relating to, or in connection with the Releases Claims prior to the Court's decision as to whether to grant Final Approval of the Settlement" Preliminary Approval Order, at ¶22. This injunction purports to bar Opt-Out Claimants from pursuing their right to arbitrate and continuing down the arduous path required by AT&T's Terms and Conditions. Moreover, a court may not stay the mass arbitration pending a class action settlement. *Abernathy v. DoorDash, Inc*., 438 F. Supp. 3d 1062 (N.D. Cal. 2020).

### 3. The Proposed Settlement Relief is Inadequate

The reverse auction led to the intended result: the proposed settlement relief falls well below what is fair, reasonable, and adequate in view of AT&T and the Release Parties' liability and ability to pay. This is an independent, albeit related, ground for rejecting the proposed settlement.

Class settlement approval in the Fifth Circuit requires that parties and courts consider the "range of possible recovery." *Reed*, 703 F.2d at 172. "The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." *Katrina Canal Breaches Litig. v. Bd. O Comm'rs*, 628 F.3d 185, 195 (5th Cir. 2010) (quoting 4 Newberg §11:46 at 133) (reversing approval of settlement "because there has been no demonstration on the record below that the settlement will benefit the class in any way, either through the disbursement of individual checks or through a cy pres distribution"). In *Katrina Can Breaches Litig.*, the Fifth Circuit reversed the final approval of the settlement because "the district court erred by approving a settlement without any assurance that attorneys' costs and administrative costs will not cannibalize" the settlement, and "we are unable to definitively state, based on the record, below, that the class will receive any benefit from the settlement." *Id*. at 196-97.

Here, the Court has certainty – Class Counsel and Kroll have assured the Court that at least 794,955 Tier 3 Settlement Class Members who filed Valid Claims for Tier 3 Cash Payments **will receive $0** for the release of their claims. Indeed, Kroll initially estimated $1.08 million for administrative costs related to AT&T 2 Class. Mot. for Prelim. Approval at ¶20. In its affidavit attached to the Motion, it states it has accrued $2.8 million in administrative costs, which are "subject to change based on factors…." Declaration of Jeanne C. Finegan of Kroll Settlement Administration LLC in Connection with Plaintiffs' Unopposed Motion for Final Approval of

Settlement (the "Kroll Affidavit"), ¶30. The Kroll Affidavit also discloses that Kroll has received **$42,772,382.30** in valid Documented Loss Cash Payments claims for the AT&T 2 Settlement Class, which payments are paid ahead of Tier 3 Cash Payments from the $28,000,000 AT&T 2 Settlement Fund (but after administrative claims). *Id.* at ¶115.

Then, Class Counsel notified the Court that it was requesting 33.33% of the $28,000,000. Motion, p. 48. All in, the AT&T 2 Net Settlement Fund is ostensibly $26,916,216.83 **in the hole before** any payment is to be paid to a Tier 3 Settlement Class Member filing a Valid Claim for a Tier 3 Cash Payment; and of the AT&T 2 Settlement Class Members who filed a Valid Claim for a Documented Loss Cash Payment, each will receive less than 50% of their documented claim.

### 4. The Releases Should Only Be Effective Against Class Members Whose Claims are Paid

Judge Posner, in an opinion penned for the Seventh Circuit, explained that "[o]pting out of a class action is very rare. Virtually no one who receives notice that he is a member of a class in a class action suit opts out. He doesn't know what he could do as an opt-out. He'd unlikely to hire a lawyer to litigate over a window [the case involved defective windows]." *Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014). AT&T, therefore, has an incentive to push through a claims-made settlement that will result in a small number of claims, very few opt-outs and a broad release. In *Pella*, the appellate court rejected that approach and reversed the district court's order approving the settlement. *Id.* This Court should deny final approval of this settlement until the parties provide additional information to support the fairness of Settlement, including how much, if any, money will be distributed to each claimant, and then provide the Class Members sufficient opportunity to opt out if they will not receive or will receive a *de minimus* settlement payment.

Alternatively, if the Court approves the Settlement, the release should only be effective against Settlement Class members who have been paid the settlement proceeds. Approving the

release only against class members who have been paid protects the Classes from overreaching by Defendants.

### 5. The Cumbersome Claims Procedures and Opt-Out Requirements Made It More Likely that Consumers Would Not Claim Benefits or Opt-Out

The Settlement Agreement contains cumbersome claims, opt-out and objection processes that are designed to discourage filing claims, and minimize opt-outs and objectors. Unless a proof of claims process is essential to distribution of a class settlement, the negative aspects of the process militate against requiring class members to go to additional time and trouble to obtain redress. This is both pragmatic – a recognition that a small percentage of class members will likely file claims – and principled – based on the concept that class members should not have to expend additional time and effort to obtain money that was wrongfully taken from them by Defendants. The purported need for requiring a claims process in this case is the assertion by Defendants that they can't calculate the amounts of late fees they collected from their own customers. Leaving aside the problematic nature of this assertion by a member of a regulated industry that has consistently alleged that it is thoroughly regulated, the claims process should not be any more onerous on Class Members than necessary to overcome Defendants' alleged inability to access their own records. The lion's share of Class Members – at least in Tier 1 and Tier 2 – are current AT&T customers, and AT&T has their current contact information.

Moreover, the Opt-Out procedures and Objection procedures are absurd. The lion's share of opt-outs will be consumers who have already initiated the arbitration process because they have chosen – even before this settlement was reached – to pursue their claims in arbitration. The have hired counsel who has vetted them, and substantially all of those claimants participated in mediation through counsel. Prior to participating in the mediation, arbitration counsel provided claimant lists, which AT&T vetted and identified prior to the mediation. The "wet ink" signature

requirement, together with the laundry list of information required to opt-out, only serves to permit AT&T and the Administrator to foot-fault opt-outs for failing to strictly comply with the opt-out procedures and unwittingly be bound by a class settlement they do not wish to be a party to.

Similarly, Kroll pointed out, and Plaintiff's argue in their Motion, that the Court "should overrule all objections" because the "objections received to date largely fail to comply with the Court's requirements for consideration." Motion, at 33. These cumbersome objection, claims and opt-out requirements are only intended to chill participation in the class and to prevent opposition to the settlement. Complex Litig. Manual (Fourth) § 21.612 (2004); *see also, Cullan & Cullan v. M-Qube, Inc.,* 2014 U.S. Dist. LEXIS at *24-25.

### 6. The Releases are Impermissibly Broad

Putting all these other defects aside, the language detailing the scope of the Release of claims by Class Members in this case is unfairly overbroad. It encompasses all claims, including those that were *not* asserted in the action. As pointed out above, a number of claims could have been asserted on behalf of the residents of the thirteen states whose legislatures have passed data breach legislation, including claims under the IL PIPA and similar statutes. The remedial scheme under those statutes authorizes an award of punitive damages, emotional distress damages, injunctive relief, attorneys fees and other damages that are not pled by the Plaintiffs and are not prayed for in the Complaint. *See, e.g., See*, 815 ILCS 505/10a. There is simply no justification for a release of this magnitude, especially in light of the paltry relief that is being provided to the class.

Moreover, there is ambiguity surrounding the separate treatment and definition of the "Release Claims" for participating Class Members and the "claims" a Class Member who opts out actually retains. The Settlement Agreement defines the term "Released Claims" broadly to encompass:

> all *claims*, defenses, demands, causes of action, rights, offsets, setoffs, suits, remedies, damages, lawsuits, costs, relief for contempt, losses, attorneys' fees, expense or liabilities of any kind whatsoever, in law or in equity, for any relief whatsoever, including monetary sanctions or damage for contempt, injunctive or declaratory relief, recission, general compensatory, special, liquidated, indirect, incidental, consequential, or punitive damages, *as well as any and all claims for treble damages, penalties, interest, attorneys' fees, costs or expenses, whether a known or unknown claim, suspected or unsuspected, existing or potential, asserted or unasserted, contingent or vested, accrued or not accrued, liquidated or unliquidated, matured or unmatured, that in any way concern, arise out of or related to the Data Incidents*, including any theories of recovery that were, or could have been, raised at any point in the Actions

Settlement Agreement, ¶183 (emphasis added). Bucking the rhetorical statement "why use one word when fifteen will do" used to mock the verbosity of lawyers, this robust definition of "Released Claims" is necessary as the lion's share of the words aside from "claims" have separate and distinct meanings from the word "claim" and failure to include those variations of a claim could lead settling Class Members to belief they could pursue individual claims absent the robust release.

In sharp contrast to the fulsome definition of Release Claims, the Settlement Agreement provides that "Individuals in the Settlement Classes who timely and validly opt out of the Settlement do not release their *individual claims* and will not obtain any benefits under the Settlement." *Id*., ¶157 (emphasis added). The use of the phrase "individual claims" rather than the use of a defined term or a robust recitation of rights released in the definition of "Release Claims" leaves one to wonder whether gamesmanship is afoot or whether AT&T intends to suppress the rights of the Opt-Outs pursuing individual claims by arguing the only thing not released was the claims, but the remaining laundry list of rights were released.

For clarity's sake, the Settlement Agreement should be far more clear by including language using the same defined terms used throughout the agreement, or including statement that

after exercising the right to opt-out, nothing contained in the Settlement Agreement is enforceable in any respect to a Class Member who opts out of the agreement.

### 7. The Releases Lack Consideration

Not only are the Releases overly broad, but the Class Members are releasing claims against parties that are not party to this case, and for which the Released Parties are providing and the Class Members are receiving no consideration. Indeed, the Released Parties include the "Defendants" and "Snowflake, Inc.," and its "agents… consultants representatives, partners, joint venturers, licensees, licensors, independent contractors, subrogees, trustees, executors, administrators, clients, customers, data owners, associated third Parties, predecessors, successors and assigns." Settlement Agreement at ¶99. Snowflake, Inc. ("Snowflake") is not a party to the Settlement Agreement, and none of its agents, consultants, joint venturers, independent contractors, clients, customers, data owners or associated third parties are identified sufficiently to determine if they warrant a Release. Further, the Settlement Funds are being funded solely by "AT&T" or "Defendants," not Snowflake. Neither Plaintiffs nor Defendants offer any support or consideration that Snowflake provided to receive the Releases from the Released Parties.

The Seventh Circuit reversed the final approval of a settlement release for this precise reason in *Reynolds v. Ben. Nat'l Bank,* 288 F.3d at 283-84 . In that case, an Illinois court approved a class action settlement between Beneficial National Bank regarding its deceptive tax refund loan program with H&R Block. *Id*. at 282. H&R Block was not a party to the class action but agreed to foot the bill for half class settlement in exchange for releases. *Id*. at 281. At preliminary approval, the Illinois court enjoined a class action pending in Texas where H&R Block was a defendant, and the Texas case was set for trial. *Id*. at 283. The appellate court reversed the district court, finding that for the release "of potentially substantial claims against H&R Block the settlement class

received no consideration. In fact, the settlement class received no consideration for the release of any claims against Block." *Id*. at 283-84.

At least in *Reynolds*, H&R Block footed half the bill. Here, neither Snowflake nor its agents, consultants, joint venturers, independent contractors, clients, customers, data owners or associated third parties are funding the settlement to the Classes, but yet are receiving Third Party Beneficiary status in exchange. This lack of consideration prevents approval of the Releases.

### 8. **Plaintiffs and Their Counsel Put Their Interests Above the Interests of the Class**

Absent class members can be bound by a class action settlement if "they are in fact adequately represented." *Hansberry v. Lee,* 311 U.S. 32, 42–43 (1940). That representation must exist at "all times." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985); *see also Ortiz v. Fibreboard,* 527 U.S. 815, 848, n. 24 (1999); *Susman v. Lincoln American Corp.,* 561 F.2d 86, 89–90 (7th Cir. 1977) (courts are required to undertake a stringent and continuing examination of representation . . . at all stages of litigation). *Sine qua non* is adequacy of representation of absent class members by the named plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a), (b); *Amchem* 521 U.S. at 622–26. Class counsel who collude with defendants' counsel are *per se* inadequate.

Taken together, it would be highly prejudicial, against public policy, and directly contrary to persuasive and controlling case law for this Court to authorize the Settlement Agreement as written. This Court should find that not only did Plaintiffs' Counsel fail to adhere to their duties to the class but also that the hurried attempt to push a settlement through is indicative of a reverse auction, which will undoubtedly prejudice the millions of absent class members by denying them further recourse and denying them any damages for their compensable harm.

## V.  CONCLUSION

For all the foregoing reasons, the Court must reject the proposed settlement. Objectors, Michael Von Lunen and Susan Barrow request that the Court issue an order (1) denying Final Approval of the Settlement; (2) decertifying the Settlement Classes; (3) finding the Class Representatives inadequate; (4) finding Class Counsel inadequate; (5) denying Class Counsels' attorneys' fees request; (6) denying the Class Representatives' service awards; and (7) sustaining this Objection in all respects; and (8) for such further relief as the Court deems just.

Dated: November 17, 2025

Respectfully submitted,

By: s/ Seth McCormick
One of Plaintiff's Attorneys

Seth McCormick
Harrer Law, P.C. (Firm ID 102120)
650 Warrenville Road, Suite 100
Lisle, Illinois 60532
Tel: (312) 858-3240
seth@harrerlaw.com

**Attestation:**

By my signature below, I attest that I am represented by Harrer Law, P.C. related to this Objection, and that I adopt this Objection as my own in all respects. To the extent any information I provided which is required by Section XI of the Settlement Agreement, including without limitation my AT&T Account Number or the email address associated with my account, I attest that after a diligent search I was unable to obtain the account number or recall which email address was associated with the account.

Michael Von Lunen                      Susan Barrow

**Attestation**:

By my signature below, I attest that I am represented by Harrer Law, P.C. related to this Objection, and that I adopt this Objection as my own in all respects. To the extent any information I provided which is required by Section XI of the Settlement Agreement, including without limitation my AT&T Account Number or the email address associated with my account, I attest that after a diligent search I was unable to obtain the account number or recall which email address was associated with the account.


_Susan Barrow_

_____          _____
Michael Von Lunen                              Susan Barrow