**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **IN RE: AT&T INC. CUSTOMER DATA SECURITY BREACH LITIGATION**<br><br>*This Document Relates to All Cases* | Case No. 3:24-cv-00757-E<br><br>MDL DOCKET No. 3:24-md- 03114-E |

**SETH MCCORMICK'S DECLARATION IN SUPPORT OF THE OBJECTIONS OF MICHAEL VON LUNEN AND SUSAN BARROW TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

I, Seth McCormick, under penalty of perjury, hereby state as follows:

1. I am over the age of 18 and competent to testify to the facts set forth herein.

2. I make this statement based upon my own personal knowledge. If called upon as a witness, I could and would testify to the truth of the matters set forth herein.

3. Capitalized terms not defined but used herein shall have the meanings ascribed to them in the Objections of Michael Von Lunen and Susan Barrow to Plaintiffs' Motion for Final Approval of Class Action Settlement.

4. I am a partner at Harrer Law, P.C. and counsel for Objectors, Michael Von Lunen and Susan Dee Barrow.

5. Harrer Law also represents approximately 1,210 Class Members who opted-out of their respective classes to exercise their right to arbitrate their claims individually with AT&T.

6. Parts of this Declaration are redacted as some of the information provided herein is subject to a confidentiality agreement Harrer Law signed in advance of the "mediation" in this case. The Objectors are filing contemporaneously herewith a Motion for *In Camera Inspection* of the Declaration so the Court can review the confidential information contained in the Declaration

as it considers whether the proposed settlement is fair and adequate, and otherwise meets the requirements of Rule 23 and the *Reed* factors.

7. The information is provided as it is important for the Court to consider this evidence, and to have another view of the representations made by Plaintiffs and Defendant regarding the mediation and negotiation of this settlement, and to understand that the Court has not been armed with the truth.

**The Mediation and the Reverse Auction**

8. On November 19, 2024, AT&T's counsel contacted Harrer Law stating "We noticed your renewed solicitation activity and claims form. Please let us know if you have some time in the next week or so to discuss." A true and correct copy of the email from AT&T's counsel to Harrer Law is attached here to as Exhibit A.

9. Despite striking me as odd that AT&T would allege "renewed" solicitation activity we agreed to conduct a call to determine AT&T's view of the case as we prepared our clients for arbitration.

10. That same day I responded to the communication in an effort to set up a conference call with AT&T's counsel.

11. In early December 2024, I participated in a conference call with AT&T's counsel, Michael McTigue, Jr. and Meredith Slaw (among others). During the conference call, indicated that it had been monitoring Harrer Law's social media activity and reached out to determine if Harrer Law's clients were interested in participating in global settlement discussions.

12. AT&T admitted on the call that it had long been monitoring the activity of plaintiff's firms efforts to engage clients to pursue claims against AT&T for both Data Incidents, and AT&T

was now in a position that it desired to "settle all the claims at one time" through a mediation tentatively set to take place in March 2025.

13. AT&T's counsel stated that it had already agreed to mediate the Class claims with Class Counsel for both Data Incidents with Robert Meyer in JAMS' offices in Los Angeles, and was inviting firms with arbitration clients to the mediation to settle all the claims at one.

14. AT&T's counsel estimated that it was in discussion with plaintiff's firms representing 250,000+ arbitration clients that had shown interest.

15. As a condition to participation in the mediation, we were required to enter into a Standstill Agreement, which agreement required that Harrer Law stop engaging new clients and were barred from commending arbitration or even the pre-dispute resolution process from the date of execution to a date that was 30 calendar days after withdrawing from the agreement, and required Harrer Law to produce its claimant's list to AT&T for vetting.

16. Refusal to enter into the Standstill Agreement meant no seat at the settlement table.

17. After the call, Harrer Law elected to continue to investigate its client's claims without the restrictions required by the Standstill Agreement.

18. In February 2025, AT&T's counsel again approached Harrer Law regarding the proposed mediation.

19. AT&T confirmed the mediation would be conducted by Robert Meyer at JAMS' offices in Los Angeles, which would take place over three days from March 17-19, 2025 and emphasized that AT&T "really wanted to get this case settled."

20. AT&T represented that it was in the arbitration claimant's best interest to participate in the mediations as firm's representing more than a quarter million individual claimant's had already agreed to participate and signed the Standstill Agreement.

21. Based on these representations, Harrer Law negotiated changes to and signed the Standstill Agreement. A true and correct copy of the Standstill Agreement is attached hereto as Exhibit B.

22. Harrer Law complied with the terms of the Standstill Agreement. It [REDACTED].

23. As the mediation approached, AT&T started changing aspects of the mediation. First, it disclosed that it would meet with the class first on March 17, 2025 and the arbitration claimant's firms were not to appear until March 18 and 19, 2025.

24. On the first day of mediation, AT&T announced to us that it had settled with the Classes, and needed additional time on the second day of mediation to finalize certain issues.

25. Based on its later disclosures, AT&T offered the classes a fraction of the value of their claims and a hefty attorneys' fee award and told them that if they did not accept, AT&T would compel them all to arbitration based on the arbitration provision contained in AT&T's terms and conditions.

26. On March 17, 2025, AT&T changed the start time for the arbitration claimants to start at 1:00 pm on March 18, 2025 and subsequently refused to meet with more than half the firm's present on that date.

27. I sat in a conference room for the entire time period of the mediation on March 18, 2025 without speaking directly to any person from AT&T and only spoke with Robert Meyer when he came in to tell us that "AT&T would not have time to meet with me [and the other firms in the room] that day, and we should go home."

28. On March 19, 2025, the "mediation" again started late. After nearly five hours of waiting to have my initial discussion regarding settlement, I informed the mediator that I had a plane to catch and needed to leave by 3:30 PM.

29. Around 3:30 pm PT on the last day of mediation, I met with AT&T and Bob Meyer for the first time. Bob Meyer did not mediate. Instead, he stood behind Michael McTigue and Meredith Slaw as Michael McTigue finally disclosed that there was no global settlement, and that no global settlement was even being considered.

30. Insteaed, Mr. McTigue stated that AT&T had settled both class actions, and the settlement offer to the arbitration claimants was take-it-or-leave-it saying "We are not deviating from these terms."

31. AT&T's counsel, not mediator Meyers, stated that it had settled with the class for the following amounts: [redacted] for customers whose SSN was accessed in the AT&T 1 Data Breach (Tier 1); [redacted] for customers whose PIII (but not their SSN) was accessed in the AT&T I Data Breach (Tier 2); and "less than [redacted] for customers who were affected by Snowflake (Tier 3).

32. When I clarified the less than [redacted] to the Snowflake class, Mediator Meyers finally chimed in to state [redacted] Aside from telling us when lunch was ready, and when to not show up to mediation, this was the extent of Mediator Meyer's participation in the mediation.

33. Mr. McTigue went on to describe the additional terms of the settlement with the Class, which included an agreement to a joint settlement, which will be confirmed in the Northern District of Texas, and the agreement contains no exclusions for "arbitration claimants," and "wet ink" signature opt-out requirements which "we are confident these terms will be confirmed."

34. After the deal with the Classes was announced, Michael McTigue stated that



35. Mr. McTigue then offered to settle with Harrer Law's clients as follows: (1) per Claimant for Tier 1; (2) per Claimant for Tier 2; and (3) per Claimant for Tier 3. The offer was take it or leave it and AT&T insisted that "We are not deviating from these terms."

36. AT&T thus knew that the true value of the claims was at least: times the amount it agreed to pay the Class for Tier 1; times the amount it agreed to pay the Class for Tier 2; and the amount it agreed to pay the Class for Tier 3.

37. Mr. McTigue and Ms. Slaw

38. At no time during the mediation did I negotiate, discuss merits, receive information related to the claims, receive discovery or documentation or any of the other trappings of a mediation. Instead, the terms of the deal my clients were offered were dictated to me by AT&T's counsel on a take it or leave it basis.

39. I promptly left the mediation after hearing AT&T's offer, and the following day Harrer Law withdrew from the Standstill Agreement.

40. After I left the mediation, I have not had any communication whatsoever with the mediator, Robert Meyers and all further discussion has been through counsel with AT&T.

41. After the mediation concluded without a sufficient number of arbitration claimants agreeing to the deal, Mr. McTigue followed up to determine if a resolution could be struck.

42. On March 24, 2025, I participated in a direct call with Mr. McTigue. On the call, he stated that AT&T would

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████.

43.     After the call, Mr. McTigue sent an email confirming that "██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

A true and correct copy of the March 24, 2025 email from AT&T's counsel is attached hereto as Exhibit C.

44.     I regarded the offer as an appeal to attorney greed – just as AT&T had done with Class Counsel.

**Attorney Qualifications and Background**:

45.     I am admitted to practice within the State Courts of Illinois and Texas, the United States District Court for the Northern District of Illinois, the United States District Court for Southern District of New York, the United States District Court for the Southern District of Texas, the United States District Court for the Northern District of Texas, the United States District Court for the Southern District of California, the Seventh Circuit Court of Appeals, the Fifth Circuit Court of Appeals and the Ninth Circuit Court of Appeals.

46.     I have practiced law since 2003 and have more than 20-years' experience in civil litigation.

47.     From 2012 until 2020, I represented (a) distressed debt investors in chapter 7 and chapter 11 proceedings around the country, (b) chapter 11 debtors in bankruptcy cases and related

litigation, and (c) chapter 7 trustees in contested creditor litigation. I also provided consulting services to investment firms for investment opportunities that involved litigation and potential bankruptcy proceedings. In addition, my firm served as counsel to the trustee of a litigation trust established for the benefit of bankruptcy creditors in the case of *In re Imperial Capital Bancorp, Inc.* Case No. 09-bk-19431 (Bankr. S.D. Cal.). I was also on the trial team for the first involuntary chapter 11 bankruptcy filing of a collateralized debt obligation in *Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.)*, Case No. 17-11628 (Bankr. SDNY).

48. I have substantial experience litigating in state and federal court, financial litigation, bankruptcy litigation, FDCPA litigation, mortgage fraud litigation, and other consumer fraud litigation involving the banking and financial sector, which are the primary focuses of my practice.

49. In 2020, I started a new firm focused entirely on consumer financial protection litigation then called The Great Lakes Consume Law Firm, LLC ("GLCLF"). My focus was primarily in cases involving the Fair Debt Collection Practices Act ("FDCPA"), the Fair Credit Reporting Act, Illinois Consumer Fraud Act, Debt Settlement Consumer Protection Act, the Credit Repair Organizations Act, the Telephone Consumer Protection Act, and other areas of commercial and consumer litigation.

50. While at GLCLF, I tried a mortgage foreclosure case wherein I obtained a verdict for reformation of a mortgage due to a mistake at inception, and defeated a large bank's foreclosure claim in *Wilmington Trust, National Association, not in its Individual Capacity, but solely as Trustee for MFRA Trust 2015-2 v. The Revocable Living Trust of Pearlie Norman and Eldee Norman, as Trustees under the Trust Agreement dated August 30, 2007, known as The Revocable Living Trust of Pearlie Norman and Eldee Norman, et al.,* Case No. 2015CH13948 (Cook Cty, Ill.)

51. I am, or have been, counsel or lead counsel in over 200 FDCPA cases in the Northern District of Illinois and Cook County, Illinois.

52. I have served as counsel in dozens of FDCPA class action cases in the United States District Court for the Northern District of Illinois and the Circuit Court of Cook County, Illinois, including the recently confirmed class in *Eloisa v. Monarch Recovery Management, LLC*, Case No. 2021CH01748 (Cook Cty., Ill.).

53. I have argued multiple times before the Seventh Circuit Court of Appeals, the Ninth Circuit Bankruptcy Appellate Panel, and have represented parties before the Fifth Circuit Court of Appeals when I successfully overturned a Western District order on the briefs without oral argument.

54. In 2024, I joined Harrer Law, PC as a partner. The firm focuses entirely on consumer financial protection.

55. I have additionally held membership and leadership positions in legal and consumer law focused groups, including membership in the National Association of Consumer Advocates, and the National Consumer Law Center, and I serve on the Advisory Board of the Chicago Bar Foundation's Justice Entrepreneurs Project

56. I also present continuing legal education seminars on consumer law topics to legal aid organizations and bar associations, and serve as a mentor to Justice Entrepreneur's Project cohort members.

57. My current hourly rate for federal court is $440.00, which is justified by my experience and knowledge of the subject, the nature and complexity of the cases, and the high level of risk involved in these types of consumer protection cases, where there is often no guarantee that the attorney will obtain their full fee, even if ultimately successful.

58. In 2022, my previous hourly rate of $380.00 was approved by Hon. James Allegretti in *Knight v. Work Order, LLC*, Case No. 2021M2000540 (Cook Cty., Ill.). Based on the passage of almost 2 years as well as the general increase in legal costs and inflation, my current rate is reasonable in comparison with the previously approve rate.

59. In 2024, my hourly rate of $425 was approved by the Hon. Michael Mullen in *Eloisa v. Monarch Recovery Management, LLC*, Case No. 2021CH01748 (Cook Cty., Ill.), where I confirmed an FDCPA class action.

60. My rate is also reasonable and below what is listed under the current updated Laffey Matrix, which the Department of Justice revised for rate determination, listing U.S. Attorneys with 21-30 years of experience at a rate of $621. *See,* https://www.justice.gov/file/1461316/download.

61. Not including the Mediation in this case, I have spent more than 40 hours of billable time preparing this Objection, meeting with clients, researching legal issues related to the numerous issues with this Settlement, reviewing the preliminary approval motion and order, the Settlement Agreement and the Motion for Final Approval along with the hundreds of pages of supporting documents and affidavits.

62. If the Court determines that the Objectors' objection has helped the Court in determining to reject that settlement agreement, or determines that the Objection aided the Class in strengthening the settlement, Objector's counsel can submit detailed time records in support of an award of attorneys' fees.

Pursuant to 28 U.S.C. § 1746(2), I, Seth McCormic, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: November 17, 2025.

/s/ *Seth McCormick*
Seth McCormick

# Exhibit A

-----Original Message-----
From: Slawe, Meredith C <Meredith.Slawe@skadden.com>
Sent: Tuesday, November 19, 2024 1:10 PM
To: Bryan Thompson <bryan.thompson@cclc-law.com>; Rob Harrer <rob.harrer@cclc-law.com>
Cc: McTigue Jr., Michael W <Michael.McTigue@skadden.com>; Powell, Gerri <Gerri.Powell@skadden.com>
Subject: AT&T

Counsel—

We represent AT&T. We noticed your renewed solicitation activity and claims form. Please let us know if you have some time in the next week or so to discuss.

Thanks,
Meredith

------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email,

you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

# Exhibit B

**Exhibit Not Filed**

**Subject to Ruling on Motion for In Camera Inspection**

# Exhibit C

**Subject:** Re: ATT
**Date:** Monday, March 24, 2025 at 2:47:40 PM Central Daylight Time
**From:** McTigue Jr., Michael W <Michael.McTigue@skadden.com>

FOR SETTLEMENT DISCUSSION PURPOSES ONLY.

HIGHLY CONFIDENTIAL

As set discussed, in concept, ATT would potentially be fine with [REDACTED]

Happy to discuss further.

Mike

On Mar 24, 2025, at 3:18 PM, McTigue Jr., Michael W (NYC) <Michael.McTigue@skadden.com> wrote:

Feel free to call me on my mobile. 347.277.4235.

Mike

On Mar 21, 2025, at 4:13 PM, McTigue Jr., Michael W (NYC) <Michael.McTigue@skadden.com> wrote:

Sounds good. That will work. I will also be on PT time.

Have a good weekend.

Mike

On Mar 21, 2025, at 1:06 PM, Seth McCormick <seth@harrerlaw.com> wrote:

Mike,

Thank you for the note. I am available on Monday after 12:30 PT. Let me know if you have time in the afternoon, and we can speak.

Seth

**Seth McCormick**
Attorney
**Harrer Law, P.C.**
650 Warrenville Rd., Suite 100
Lisle, IL 60532
Main 312-858-3240 | Fax 312-610-5646

HarrerLaw.com
****Please Note**** Our firm has changed its name to **Harrer Law, P.C**., and my email address is now seth@harrerlaw.com

*This email is for the exclusive use of the intended recipient(s) and may contain confidential information, including privileged communication and/or attorney work-product. If you are not an intended recipient, please notify the sender that you received it, delete the email and any attachment(s) from your computer, and do not copy or disclose the email or attachment(s) to anyone else. Your receipt of this message is not expressly or impliedly intended to waive any applicable right or duty to protect its confidentiality.*

---

**From:** McTigue Jr., Michael W <Michael.McTigue@skadden.com>
**Date:** Friday, March 21, 2025 at 7:59 AM
**To:** Seth McCormick <seth@harrerlaw.com>
**Subject:** ATT

Hi Seth,

It was good seeing you at the mediation.

Can we find some time on Monday to continue our discussion?

Thanks,
Mike

------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================