# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| IN RE: AT&T INC. CUSTOMER DATA SECURITY BREACH LITIGATION | § § § § § § § § § § § | CASE NO. 3:24-cv-00757-E MDL DOCKET NO. 3:24-md-03114-E |

# AT&T DEFENDANTS' OMNIBUS RESPONSE TO CERTAIN OBJECTIONS

# Table of Contents

**Page**

Argument.................................................................................... 1

I.    The Court Should Reject The Majority Of The
Objections As Non-Compliant With The Court's Order......... 1

II.    The Objections Submitted By Harrer and Potter Handy
Should Be Rejected Because Of Irreconcilable Conflicts
Of Interest. ............................................................................ 5

III.    Objectors' Contentions That The Opt-Out
Requirements Are Overly Onerous Are Baseless.................. 9

    a.    The Court-Approved Opt-Out Requirements Are
Reasonable and Enforceable. ...................................... 13

    b.    The Opt-Out Requirements Are Necessary To
Prevent Abuses By Counsel Who Purport To
Represent Class Members As Part Of Mass
Proceedings. ............................................................... 15

IV.    The Court-Approved Claims Procedures Are
Reasonable and Enforceable. ............................................. 19

V.    Objectors' Assertion That The Settlement Agreement
Contains An "Unlawful" Injunction Against Parallel
Proceedings Is Without Merit.............................................. 20

VI.    The Udell Objectors' Estoppel Arguments Ignore The
Opt-Out Process And Fundamentally Misunderstand
The Law............................................................................... 22

VII.    The Releases Are Valid And Fair. ....................................... 27

VIII.  Kristal Quarker's Objections Regarding A Putative
"Power Imbalance" And Lack Of An Appeal Process
Are Without Merit............................................................... 31

IX.   Because Unclaimed Funds Will Not Revert To AT&T, Ms. Quarker's Objection Is Unfounded. ............................... 32

Conclusion. ............................................................................................. 33

## Table of Authorities

**Page**

**CASES**

*American Express Co. v. Italian Colors Restaurant*,
     570 U.S. 228 (2013) ........................................................................ 25

*In re AT&T Mobility Wireless Data Services Sales Tax Litigation*,
     789 F.Supp.2d 935 (N.D. Ill. 2011) ........................................... 26, 27

*Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive
     Engineers*,
     398 U.S. 281 (1970) ........................................................................ 21

*Bellows v. NCO Financial Systems, Inc.*,
     No. 07-CV-1413, 2009 WL 10725745 (S.D. Cal. June 19,
     2009) ................................................................................................ 14

*Blackmon v. Zachary Holdings, Inc.*,
     No. 20-CV-00988, 2022 WL 3142364 (W.D. Tex. Aug. 5,
     2022) ................................................................................................ 28

*Braswell v. Bow Plumbing Group, Inc.*,
     No. 2:21-cv-0025, 2024 WL 2401782 (M.D. Ala. May 23,
     2024) ................................................................................................ 17

*In re CenturyLink Sales Practices & Securities Litigation*,
     MDL No. 17-2795, 2020 WL 869980 (D. Minn. Feb. 21, 2020) ..... 23

*Chalian v. CVS Pharmacy, Inc.*,
     No. 16-8979, 2020 WL 7347866 (C.D. Cal. Oct. 30, 2020) ............ 17

*In re Corrugated Container Antitrust Litigation*,
     643 F.2d 195 (5th Cir. 1981) ......................................................... 29

*Davis v. CenturyLink, Inc.*,
     No. 24-40381, 2025 WL 1009556 (5th Cir. Apr. 5, 2025) .............. 29

*Davis v. Wakelee*,
    156 U.S. 680 (1895) ................................................................. 22

*In re Deepwater Horizon*,
    No. 20-30617, 2021 WL 3501651 (5th Cir. Aug. 9, 2021) ......... 13-14

*In re Deepwater Horizon*,
    723 F.App'x 247 (5th Cir. 2018) .................................................. 19

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ........................................... 28, 29

*In re Diet Drugs*,
    282 F.3d 220 (3d Cir. 2002) .................................................... 20, 21

*In re East Palestine Train Derailment*,
    No. 4:23-cv-0242, 2024 WL 4370003 (N.D. Ohio Sept. 27,
    2024) ........................................................................................... 7

*In re Educational Testing Service Praxis Principles of Learning &*
    *Teaching, Grades 7-12 Litigation*,
    447 F.Supp.2d 612 (E.D. La. 2006) .............................................. 19

*In re Farmers Group Stock Options Litigation*,
    No. 88-4994, 1991 WL 332500 (E.D. Pa. Dec. 19, 1991) ............... 23

*In re Flint Water Cases*,
    571 F.Supp.3d 746 (E.D. Mich. 2021) ........................................... 7

*Fujimoto v. Rio Grande Pickle Co.*,
    414 F.2d 648 (5th Cir. 1969) ...................................................... 25

*Hallie v. Wells Fargo Bank, N.A.*,
    No. 12-0235, 2015 WL 1914864 (N.D. Ind. Apr. 27, 2015) ........... 14

*Jabbari v. Wells Fargo & Co.*,
    No. 15-2159, 2017 WL 3478868 (N.D. Cal. July 8, 2017),
    *aff'd*, 813 F.App'x 259 (9th Cir. 2020) ......................................... 22

*Jones v. Singing River Health Services Foundation*,
    865 F.3d 285 (5th Cir. 2017) .................................................. 30, 31

*Klein v. O'Neal, Inc.*,
　　705 F.Supp.2d 632 (N.D. Tex. 2010) .............................................. 31

*Matson v. NIBCO Inc.*,
　　No. 19-0717, 2021 WL 2374312 (W.D. Tex. June 10, 2021) .......... 17

*Morgan v. Sundance, Inc.*,
　　596 U.S. 411 (2022) ...................................................................... 25

*Moulton v. U.S. Steel Corp.*,
　　581 F.3d 344 (6th Cir. 2009) ..................................................... 8, 14

*New Hampshire v. Maine*,
　　532 U.S. 742 (2001) ...................................................................... 22

*Otanez Verdugo v. Capstone Logistics, LLC*,
　　No. 2:22-cv-03141 (C.D. Cal. Nov. 23, 2022)................................ 15

*Parker v. ABC Debt Relief Co.*,
　　No. 10-1332, 2011 WL 13156874 (N.D. Tex. Nov. 4, 2011) ........... 25

*Price v. Drexel Burnham Lambert, Inc.*,
　　791 F.2d 1156 (5th Cir. 1986) ....................................................... 25

*Rescigno v. Statoil USA Onshore Properties Inc.*,
　　No. 16-0085, 2023 WL 145008 (M.D. Pa. Jan. 10, 2023)............... 24

*Richardson v. Wells Fargo Bank, N.A.*,
　　839 F.3d 442 (5th Cir. 2016) ......................................................... 27

*Salinas v. U.S. Xpress Enterprises, Inc.*,
　　No. 13-0245, 2018 WL 1477127 (E.D. Tenn. Mar. 8, 2018)........... 28

*Stark v. Patreon, Inc.*,
　　No. 22-3131, 2025 WL 1592736 (N.D. Cal. June 5, 2025)............. 18

*In re Syngenta AG Mir162 Corn Litigation*,
　　No. 14-md-2591, 2021 WL 3025471 (D. Kan. May 14, 2021) ........ 14

*In re TikTok, Inc., Consumer Priv. Litigation*,
　　565 F.Supp.3d 1076 (N.D. Ill. 2021) .............................................. 16

*In re TikTok, Inc., Consumer Priv. Litigation*,
    617 F.Supp.3d 904 (N.D. Ill. 2022) ................................................ 22

*Zedner v. United States*,
    547 U.S. 489 (2006) ...................................................................... 22

**STATUTES**

28 U.S.C. §2072 ...................................................................................... 25

28 U.S.C. §2283 ...................................................................................... 20

**OTHER AUTHORITIES**

Report of Referee, *Florida Bar v. Udell*,
    No. SC2025-0166 (Fla. Sept. 17, 2025) ......................................... 12

Michael W. McTigue Jr. & Meredith C. Slawe, *Private Power, Public
    Harm: The Coercive Dynamics of Mass Arbitration*, U.S.
    Chamber of Commerce Inst. for Legal Reform (Dec. 2025)........... 16

Letter from Chris Carr, Georgia Attorney General, to JAMS,
    American Arbitration Association, and National Arbitration
    and Mediation (Dec. 1, 2025), https://law.georgia.gov/press-
    releases/2025-12-08/carr-sends-warning-arbitration-
    organizations-accused-abusive-practices ...................................... 16

AT&T submits this Omnibus Opposition to certain Objections to the Settlement.[1] The Settlement has received an overwhelmingly positive response: millions submitted Claim Forms seeking to participate, and only 40 Objections were submitted. Most of those Objections fail to provide the basic information required by the Court's Preliminary Approval Order and can be rejected on that basis alone. In addition, several Objections appear to have been orchestrated by attorneys seeking to disrupt a fair and reasonable settlement for their own gain. Their contentions have no basis in fact and are legally unsupported. For these reasons, AT&T respectfully requests that the Court overrule all Objections.

## Argument.

## I.    The Court Should Reject The Majority Of The Objections As Non-Compliant With The Court's Order.

In its Preliminary Approval Order (ECF 298), the Court ordered that any objection to the Settlement must be filed on the Court's docket

---

[1]    *See* ECF 321, 364, 368, 370. Class Counsel will be addressing these and other Objections. "AT&T" refers to defendants AT&T Inc., AT&T Corporation and AT&T Mobility LLC. Unless otherwise defined herein, capitalized terms have the meaning set forth in the Settlement Agreement. ECF 356-1. "McTigue Decl." refers to the Declaration of Michael W. McTigue Jr. filed herewith and "Kroll Decl." refers to the Declaration of Jeanne C. Finnegan of Kroll Settlement Administration LLC filed December 18, 2025.

and mailed to the Settlement Administrator, Class Counsel, and AT&T's Counsel by the Objection Deadline. For such "an objection to be considered by the Court, the objection must also set forth" specific pieces of information necessary to the evaluation of the objection. ECF 298, ¶17(a)–(j). Only two Objections (ECF 364, 368) comply with the Court's required procedure. The remaining Objections failed to provide information required by ¶17(a)–(j) of the Preliminary Approval Order or were filed after the Court's November 17 deadline to file objections, as the following chart sets forth:

| Objection (docket number or Objector's name if not filed on the docket) | Provisions of Preliminary Approval Order ¶17 Not Satisfied by Objection |
|---|---|
| ECF 312 | ¶17(c)-(i) |
| ECF 371 | ¶17(b)-(i) |
| Joseph Aguinaga | ¶17(a), (c)-(j) |
| ECF 314 | ¶17(a), (c)-(j) |
| ECF 315 | ¶17(c)-(h) |
| ECF 316 | ¶17(c)-(i) |
| Billie Howard | ¶17(b)-(i) |

| Objection (docket number or Objector's name if not filed on the docket) | Provisions of Preliminary Approval Order ¶17 Not Satisfied by Objection |
|---|---|
| ECF 321 | ¶17(a), (c)-(i) |
| Dawn Stover | ¶17(c)-(i) |
| Hong Zhang | ¶17(a)-(j) |
| Jenny Moyer Murphy | ¶17(a), (c)-(i) |
| Jeffrey M. Nadeau | ¶17(g) |
| ECF 343 | ¶17(a), (c)-(i) |
| ECF 350 | ¶17(c)-(i) |
| Ollie N. Talbott Jr. | ¶17(a), (c)-(i) |
| ECF 363 | ¶17(c)-(i) |
| ECF 370 | ¶17(a), (c),(e)-(j); untimely |
| ECF 374 | ¶17(a), (d)-(h) |
| ECF 376 | ¶17(a)-(i) |
| ECF 377 | ¶17(a), (c)-(j) |
| ECF 375 | ¶17(c)-(i) |

| Objection (docket number or Objector's name if not filed on the docket) | Provisions of Preliminary Approval Order ¶17 Not Satisfied by Objection |
|---|---|
| ECF 378 | ¶17(a), (c)-(j) |
| ECF 379 | ¶17(c)-(i) |
| ECF 380 | ¶17(e), (g) |
| ECF 383 | ¶17(a), (c)-(h), (j) |
| ECF 385 | ¶17(c),(g) |
| ECF 389 | ¶17(a), (c)-(j); untimely |
| ECF 386 | ¶17(c)-(g) |
| Julia Diaz | ¶17(g)-(j) |
| Carladrea Huey | ¶17(c), (g)-(i) |
| ECF 351 | ¶17(b), (d)-(i) |
| Yulanda R. King | ¶17(c)-(i); untimely |
| Eric De La Cruz | ¶17(c)-(j); untimely |
| Katie Dows | ¶17(c)-(j); untimely |
| ECF 317 | ¶17(b)-(i) |

| Objection (docket number or Objector's name if not filed on the docket) | Provisions of Preliminary Approval Order ¶17 Not Satisfied by Objection |
|---|---|
| ECF 382 | ¶17(b)-(i); untimely |
| ECF 391 | ¶17(g)-(h); untimely |

The Court may reject these Objections immediately because they do not comply with the Court's Order. *See* ECF 298 ("Any Settlement Class Member who does not make their objections in the manner and by the date set forth in the Agreement **shall be deemed to have waived any objections and shall be forever barred from raising such objections in this or any other action or proceeding, absent further order of the Court**." (emphasis added)). In any event, these Objections present no basis to deny Final Approval.

## II.    The Objections Submitted By Harrer and Potter Handy Should Be Rejected Because Of Irreconcilable Conflicts Of Interest.

The Objections submitted by Harrer Law, P.C. and Potter Handy LLP should be rejected in their entirety because those counsel are subject to disabling conflicts of interest. They represent objectors seeking to set aside the proposed Settlement while simultaneously representing individuals who have submitted Claim Forms hoping to

participate in that Settlement. That conflict alone is sufficient reason for the Court to reject those Objections.

Harrer has acknowledged it simultaneously represents objectors, individuals who chose to opt out of their respective classes, and individuals who chose to file Claims. McTigue Decl. ¶7.[2]

A review of the list of over 4,000 individuals purportedly joining Potter Handy's objection likewise reveals substantial conflicts. ECF 370. Flouting the Court-ordered procedure for submitting compliant objections, Potter Handy's list only included the first and last name of each putative objector. *Id.* Given that these Settlement Classes include tens of millions of consumers, that information is patently insufficient to confirm whether those individuals are actually Settlement Class

---

[2] Harrer's close relationship with its two timely Objectors—Harrer's Chief Operating Officer, Michael Von Lunen, and Harrer attorney Seth Barrow McCormick's mother, Susan Barrow—raise serious concerns as well. McTigue Decl. ¶6. AT&T informed Harrer that its objections should be withdrawn in light of these conflicts. *Id.* ¶7. Implicitly acknowledging those conflicts, Objector's counsel filed a belated "Notice of Joinder" purporting to add two individuals to Harrer's objections—less than 3 hours before AT&T's and Class Counsel's deadline to respond to issues raised by Harrer *in camera.* ECF 391. Even if a Notice of Joinder submitted more than three weeks after the objections deadline could cure Harrer's conflicts, which it cannot, the filing is untimely and no less problematic. For example, one of the "Joining Objectors," LaTonyia McClain, **listed the same email address and Class Member ID as Seth McCormick's mother, Susan Barrow**. McTigue Decl. ¶8. In addition, based on the information provided, LaTonyia McClain does not appear to be a member of either Settlement Class. *Id.* The Court should disregard Harrer's untimely Notice of Joinder.

Members entitled to lodge objections. Nevertheless, the limited information provided indicates that the first and last names of numerous Potter Handy clients who separately submitted Claim Forms seeking to participate in the Settlement **also** appear on Potter Handy's list of objectors, and that numerous putative objectors on that list also submitted requests to opt out of the Settlement. McTigue Decl. ¶11.

Objectors' counsel's dual representation of objectors seeking to disrupt the Settlement and individuals seeking to participate in the Settlement creates an irreconcilable conflict of interest. Courts have overruled objections under similar circumstances. *See, e.g.*, *In re E. Palestine Train Derailment*, 2024 WL 4370003, at *6-7 (N.D. Ohio Sept. 27, 2024), *aff'd*, 2025 WL 3280837 (6th Cir. Nov. 25, 2025) (overruling "vague and conclusory objections to the settlement" where objectors' counsel "simultaneously represent[ed] Settlement Class Members with directly opposing interests" including individuals "who objected to the settlement and sought to disrupt and block it" and individuals "participating in the settlement…, filed claims, and have raised no objections"); *In re Flint Water Cases*, 571 F.Supp.3d 746, 820 (E.D. Mich. 2021) (counsel could be "advancing opposing interests in a single

piece of litigation" where "objectors seek to have the entire settlement rejected whereas non-objectors want the settlement approved as written").

Similarly, Harrer's and Potter Handy's simultaneous representation of Settlement Class Members seeking to participate in the Settlement and Settlement Class Members seeking to **opt out** of the Settlement independently creates a conflict of interest. Courts recognize such dual representations might violate an attorney's ethical obligations. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 354 (6th Cir. 2009) (rejecting contention that attorney should have been permitted to represent class members and opted-out class members where attorney promised a higher settlement for individuals who opted out, thereby "creat[ing] an ethical quagmire" if attorney also represented class members).

Each of these actual conflicts of interest is disabling. The Court should therefore disregard and overrule the Objections submitted by Harrer and Potter Handy.

8

## III.   Objectors' Contentions That The Opt-Out Requirements Are Overly Onerous Are Baseless.

While AT&T will address all opt-out requests in a forthcoming submission, three sets of objectors, represented by three separate firms—Harrer, Potter Handy, and Beighley, Myrick, Udell & Zeichman P.A. ("Udell")—complain that the opt-out requirements set forth in the Court's Preliminary Approval Order are overly onerous. ECF 364, 368, 370. They do so only to advance their parallel threats to pursue mass arbitrations or small claims actions against AT&T, as explained below.

**Harrer**. To facilitate a planned mass arbitration filing against AT&T, Harrer submitted opt-out requests for over one thousand individuals. McTigue Decl. ¶3. Not only are many of these opt-out requests rife with deficiencies (*see infra* Section III(B))—suggesting that those individuals may not be aware of the actions taken on their behalf—but some requests indicate that Harrer likely mischaracterized the Settlement in their communications with Settlement Class Members. McTigue Decl. ¶¶4-5.

Two opt-out requests submitted by Settlement Class Members represented by Harrer Law reference a "$2.50 settlement," suggesting Harrer Law misleadingly suggested Settlement Class Members would

only receive $2.50 if they participated in the Settlement, directly contradicting the Settlement Agreement and Court-approved Notice materials distributed to the Settlement Classes. *See* Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Applications for Attorneys' Fees, Costs, and Service Awards with Incorporated Memorandum of Law, ECF 356 at 10-12 (describing Settlement Class Member benefits, including up to $5,000 Documented Loss Cash Payments for the AT&T 1 Settlement Class, up to $2,500 Documented Loss Cash Payments for the AT&T 2 Settlement Class, and alternative tiered Cash Payments, subject to *pro rata* adjustments); McTigue Decl. Ex. 1.

On November 20, 2025, AT&T sent correspondence to Harrer expressing concerns about misleading communications to Settlement Class Members and asking Harrer to preserve those communications. McTigue Decl. Ex. 2. Harrer did not respond. McTigue Decl. ¶5.

**Potter Handy.** Also in anticipation of a mass arbitration filing against AT&T, Potter Handy submitted opt-out requests for over one thousand individuals. McTigue Decl. ¶9. These too suffered from glaring deficiencies, including (i) blank forms, (ii) missing signatures, and (iii)

submissions from individuals who previously released their claims against AT&T through settlements with other counsel, submitted a Claim Form, and/or do not appear to be members of either Settlement Class. *Id.* at ¶10. There is reason to believe that, like Harrer, Potter Handy misinformed Settlement Class Members when soliciting opt outs. *Id.* Ex. 3,

For example, a communication from Potter Handy to its clients included in a September 2025 social media post shows that the firm falsely suggested that the only way consumers could "continue with" claims against AT&T would be to "print the attached document, sign it, and mail it back" to facilitate the firm's submission of an opt-out request on their behalf. McTigue Decl. Ex. 3. The email then "**encourage[d]**" its clients to opt out of the Settlement so they could "maintain [their] right to bring a **lawsuit** against AT&T for their violations" (emphasis added). *Id.* Potter Handy appeared to conceal its actual intent to pursue **arbitrations** against AT&T, not litigation, stating clients who opt-out will be represented by the firm "through the **litigation process**." (emphasis added). *Id.* One consumer stated the

firm was "encouraging you to drop out of the 'class action' suit so they can represent you in a direct litigation suit." *Id.*

**Udell**. Udell has filed over 50 complaints in small claims court against AT&T related to the AT&T 1 Data Incident, many on behalf of individual plaintiffs, and over a dozen on behalf of Mr. Udell's own limited liability company (Claims Holding Group, LLC). *See* McTigue Decl. ¶13. Udell has employed questionable tactics against AT&T before. In response to a complaint from the Florida Bar in connection with a related AT&T matter, a referee appointed by the Florida Supreme Court recommended Udell be publicly reprimanded and pay nearly $7,000 in costs, finding Udell violated Florida Rule Regulating the Bar 4-3.1 for failing "to correct his pleadings after being made aware of information showing that the claims he was pursuing were factually unsupported." *See* Report of Referee, *Florida Bar v. Udell*, No. SC2025-0166 (Fla. Sept. 17, 2025), at 13, 15, 30-31.

The Harrer, Potter Handy, and Udell Objections to the opt-out requirements are without merit and should be overruled for the following reasons.

### a. The Court-Approved Opt-Out Requirements Are Reasonable and Enforceable.

This Court has already reviewed and approved the opt-out requirements on multiple occasions. The Court's Preliminary Approval Order sets forth the requirements for any member of the Settlement Class to opt out from the class. ECF 298 ¶15. The Court later rejected the contention that the opt-out requirements "unduly burden[ed] class members seeking to opt-out the settlement," and highlighted the importance of compliance, finding **"the types of limitations that Claimants challenge" were "appropriate to guard against collusion and ensure that individual circumstances can be considered."** ECF 305 ¶¶8, 10 (emphasis added). "As the Fifth Circuit recognized almost a decade ago, an individual opt-out requirement of precisely the type in the preliminary approval order here is a 'common and practical requirement' that falls within this Court's 'especially strong and flexible managerial power in this highly complex MDL.'" *Id.* at 10 (citations omitted).

Courts routinely approve opt-out requirements substantially identical to those at issue here, including handwritten ("wet ink") signatures. *See, e.g.*, *In Re Deepwater Horizon*, 2021 WL 3501651, at *2

13

(5th Cir. Aug. 9, 2021) (because "the MSA required [class member] to sign the form personally in wet ink" and "he indisputably did not," district court "was correct to conclude that [class member's] opt-out form was deficient"); *In re Syngenta AG Mir162 Corn Litig.*, 2021 WL 3025471, at \*10 (D. Kan. May 14, 2021) (a "handwritten, wet ink signature provided assurance that all potential [c]lass [m]embers, whether represented or not, would exercise their opt-out rights only after personally evaluating the pros and cons of doing so").[3]

Potter Handy's argument that the opt-out requirements denied Settlement Class Members the right to counsel is also without merit. Potter Handy cites no authority for the proposition that requiring personal signatures on opt-out requests implicates the right to counsel. Indeed, Potter Handy has supported similar individualized opt-out procedures when it served their interests. *See, e.g.*, ECF 36-1, *Otanez*

---

[3]    *See also Hallie v. Wells Fargo Bank, N.A.*, 2015 WL 1914864, at \*4 (N.D. Ind. Apr. 27, 2015) (describing "personal signature requirement" as "standard" in class actions and "not onerous"); *Bellows v. NCO Fin. Sys., Inc.*, 2009 WL 10725745, at \*4 (S.D. Cal. June 19, 2009) (signature requirement "with identifying information is unburdensome and insures that potential class members knowingly act with the intent to exclude themselves from the class action settlement," "protect[ing] against abuses by an attorney who without authority seeks to improperly interfere with a class action settlement"); *Moulton*, 581 F.3d at 355 ("Given the real risk that the attorney-signed opt-out forms did not reflect the wishes of class members, the district court appropriately exercised its power by requiring individually signed opt-out forms (and rejecting the attorney-signed forms).").

*Verdugo v. Capstone Logistics, LLC*, No. 2:22-cv-03141 (C.D. Cal. filed Nov. 23, 2022) (Potter Handy moving to approve a class action settlement requiring mail-in-only, personally-signed opt-out submissions). Potter Handy's collection and submission of opt-out requests on behalf of their clients further shows that the opt-out requirements did not interfere with clients' ability to "rely on counsel." ECF 370 at 2; McTigue Decl. ¶9.

Here, Objectors' contention that the opt-out requirements are overly onerous is further undermined by the **thousands** of Settlement Class Members who have submitted facially compliant opt-out requests—including over a thousand facially-compliant requests **submitted by individuals represented by these objectors' counsel**—demonstrating that consumers and their counsel complied with the Court-approved opt-out requirements without any difficulty. McTigue Decl. ¶¶2, 4, 10, 15.

**b.  The Opt-Out Requirements Are Necessary To Prevent Abuses By Counsel Who Purport To Represent Class Members As Part Of Mass Proceedings.**

Individualized opt-out procedures, including personal handwritten signatures, are especially necessary where, as here, there is a serious

15

risk that counsel seeking to pursue parallel mass arbitrations or other mass proceedings would attempt to opt out all of their purported clients without actual Settlement Class Member authorization or an informed Settlement Class Member decision-making process. *See In re TikTok, Inc., Consumer Priv. Litig.*, 565 F.Supp.3d 1076, 1092-93 (N.D. Ill. 2021) (rejecting objection challenging individualized opt-out requirements made by counsel pursuing parallel mass arbitration because such requirements, including individual signatures, are "'vital' to ensuring" class members are "individually consenting to opt out" and noting "courts have routinely enforced the requirement that class members individually sign and return a paper opt-out form").[4]

As shown, AT&T's review of publicly available communications and opt-out requests indicate Harrer and Potter Handy likely misled

---

[4]   Tactics employed by firms seeking to bring mass arbitrations often raise serious consumer protection issues, including misleading solicitations and claims brought without client authorization or awareness. *See* Michael W. McTigue Jr. & Meredith C. Slawe, *Private Power, Public Harm: The Coercive Dynamics of Mass Arbitration*, U.S. Chamber of Commerce Inst. For Legal Reform 17-18 (Dec. 2025) ("consumer protection concerns that pervade modern mass arbitration solicitation practices, and the attendant ethical issues inherent in these practices, are serious and warrant close attention"); *id.* at 35 ("[C]laimants who sign up for mass arbitrations may be unaware at the intake stage, or indeed at any point, which law firm (or set of firms) will be representing them They may not know that they are represented at all."); Dec. 1, 2025 Letter from Georgia Attorney General Chris Carr to JAMS, American Arbitration Association, and National Arbitration and Mediation, *available at* https://law.georgia.gov/press-releases/2025-12-08/carr-sends-warning-arbitration-organizations-accused-abusive-practices (raising concerns about mass arbitration practices including "situations in which law firms []

16

Settlement Class Members about the Settlement when soliciting opt-outs, thereby preventing these Settlement Class Members from making informed, individual decisions about participating or opting out of the Settlement. McTigue Decl. ¶¶5, 12.

Courts routinely invalidate opt-out requests procured through misleading communications because class members are entitled to "objective, neutral information about the nature of the claim and the consequences of proceeding as a class." *Braswell v. Bow Plumbing Grp., Inc.*, 2024 WL 2401782, at *3 (M.D. Ala. May 23, 2024) (finding plaintiffs' counsel "undermined… the integrity of the class settlement process by providing incomplete, misleading, and coercive information to potential class members"); *see also Matson v. NIBCO Inc.*, 2021 WL 2374312, at *6, *8 (W.D. Tex. June 10, 2021) (invalidating over 400 opt-out requests that "appear to have been the result of the misleading, coercive, and factually inaccurate letters" sent by counsel falsely stating payment to each class member would be "less than $1,000").[5]

purport to represent consumers who… thought they were signing up for a class action, not an arbitration; are already represented by another firm in a separate proceeding involving the very same claim; are not even party to the underlying arbitration agreement and have not engaged in a transaction giving rise to the claim").

[5]  *See also Chalian v. CVS Pharmacy, Inc.*, 2020 WL 7347866, at *3-4 (C.D. Cal. Oct. 30, 2020) (granting TRO and ordering plaintiff's firm to cease communication with

17

Many of the opt-out requests submitted by individuals represented by Harrer, Potter Handy, and Udell raise further concerns. These include: (1) hundreds of opt-out requests submitted by individuals who already released their claims through settlements involving separate counsel, (2) hundreds of opt-out requests submitted by individuals who are not members of either Settlement Class, and (3) hundreds of opt-out requests submitted by individuals who separately submitted a Claim Form seeking compensation from the Settlement. McTigue Decl. ¶¶4, 10, 15.

The apparent confusion created by Objectors' counsel's campaigns to amass opt-outs to pursue mass arbitrations or small claims court proceedings confirms the Court-approved, individualized opt-out requirements are necessary and appropriate. Accordingly, the Court should affirm its prior determinations that the opt-out requirements are reasonable and enforceable.

---

settlement class members after finding its misleading communications would "cause imminent harms" to potential plaintiffs who may "relinquish valuable settlement benefits based on such misleading information"); *Stark v. Patreon, Inc.*, 2025 WL 1592736, at *5-6 (N.D. Cal. June 5, 2025) (invalidating opt-outs after company offered class members purportedly a "better deal" than the settlement and failed to inform class members of certain rights under the settlement agreement).

## IV.    The Court-Approved Claims Procedures Are Reasonable and Enforceable.

Harrer further complains that the requirement to submit a Claim Form to receive compensation is overly onerous. ECF 368. But courts routinely uphold settlement agreements that require class members to submit claims forms in order to receive a settlement payment. *See, e.g.*, *In re Deepwater Horizon*, 723 F.App'x 247, 250 (5th Cir. 2018) ("A timely filed Claim Form is required for participation in the settlement."); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F.Supp.2d 612, 627 (E.D. La. 2006) (rejecting objectors' contention that claims process was "unnecessary" and finding "[r]equiring the claimant to submit a claim form is standard procedure in cases of this kind"). Objectors fail to address the fact that millions of Settlement Class Members successfully submitted Claim Forms, including one of the Harrer Objectors (Harrer's Chief Operating Officer) and dozens of other Harrer clients who did not join their Objection. McTigue Decl. ¶6; Kroll Decl. ¶5.

19

## V.    Objectors' Assertion That The Settlement Agreement Contains An "Unlawful" Injunction Against Parallel Proceedings Is Without Merit.

One set of objectors (represented by Harrer) argues the Settlement Agreement contains an unlawful injunction against parallel proceedings. ECF 368. But courts regularly enjoin parallel proceedings as part of their power to protect their jurisdiction over complex multidistrict litigation. *See In re Diet Drugs*, 282 F.3d 220, 235-36 (3d Cir. 2002) (in MDL consolidating numerous cases, upholding order enjoining state court actions to "minimize the various difficulties associated with duplicative and competing lawsuits," finding court's "'flexibility and authority to decide' such complex nationwide cases" justified injunction).

The Court's Preliminary Approval Order here provisionally enjoining parallel proceedings, which by its own terms will expire upon the Court's final approval decision, is lawful and necessary to protect its jurisdiction over the present matter. As Class Counsel demonstrated, under the "necessary in aid of jurisdiction" exception to the Anti-Injunction Act, 28 U.S.C. §2283, federal courts may enjoin parallel proceedings to prevent such proceedings "from so interfering with a

20

federal court's consideration or disposition of a case 'as to seriously impair the federal court's flexibility and authority to decide that case.'" ECF 283 at 49 (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)). By entering the Preliminary Approval Order enjoining parallel proceedings, the Court lawfully exercised its "flexibility and authority to decide such complex nationwide cases" such as this one. *See In re Diet Drugs*, 282 F.3d at 235.

Harrer's conduct further validates Class Counsel's concerns. *See* ECF 283 at 50 (noting parallel proceedings "would substantially interfere with this Court's jurisdiction and ability to effectively manage the Settlement process," including "confusion among Settlement Class Members about their rights and options"). As detailed in Section III, *supra*, AT&T is concerned that Harrer and other objectors' counsel engaged in misleading communications with Settlement Class Members in its efforts to secure opt-out requests. This is exactly the type of harm to the Court's jurisdiction and management of a complex nationwide litigation that the injunction was intended to prevent.

## VI.   The Udell Objectors' Estoppel Arguments Ignore The Opt-Out Process And Fundamentally Misunderstand The Law.

Udell further argues that AT&T is prohibited from entering into a class settlement because it has "successfully litigated the enforceability of the CSA's class action waiver and arbitration provision" in prior cases. ECF 364 at 17. Udell cites no authority supporting this proposition.[6] Courts routinely approve class settlements notwithstanding the existence of a class waiver and arbitration agreement, holding that the litigation risks associated with the existence of such provisions specifically weigh **in favor of** approval.[7]

Udell's assertion that AT&T is "forc[ing] a class action settlement" on arbitration claimants, ECF 364 at 18, is also baseless. Settlement

---

[6]   The inapposite cases Udell cites for general judicial estoppel principles involve neither class settlements nor arbitration issues. *See Zedner v. United States*, 547 U.S. 489, 504 (2006) (criminal case finding "no basis for applying the doctrine of judicial estoppel" when petitioner moved to dismiss for failure to comply with the Speedy Trial Act); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (finding "claim that the Piscataqua River boundary runs along the Maine shore" was "clearly inconsistent" with position taken in prior litigation interpreting boundary determination from 1740); *Davis v. Wakelee*, 156 U.S. 680, 689 (1895) (finding plaintiff estopped from arguing judgment was void after previously arguing same judgment was valid to obtain discharge in bankruptcy).

[7]   *See, e.g.*, *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F.Supp.3d 904, 935 (E.D. Wis. 2024) (granting final approval of class settlement despite class waiver provision in customer agreement because "the significant litigation risks Plaintiffs would face if the cases were to proceed weigh heavily in favor of approving the settlement…. Foremost of these are the class action waivers and mandatory individual arbitration clauses contained in TikTok's terms of service."); *Jabbari v. Wells Fargo & Co.*, 2017 WL 3478868 (N.D. Cal. July 8, 2017) ("[T]he Settlement is fair and reasonable to Settlement Class Members when balanced against the probable outcome of further litigation,

22

Class Members may opt out of the Settlement and pursue their claims individually in arbitration. Courts recognize that such an opt-out remedy is sufficient to protect arbitration rights. *See, e.g.*, *In re Farmers Grp. Stock Options Litig.*, 1991 WL 332500, at *2 (E.D. Pa. Dec. 19, 1991) (where "[n]either the defendants nor the plaintiff class insisted on arbitration," if "individual plaintiffs choose arbitration, they may do so at the cost of opting out of the class settlement" and the objectors who "chose to opt out… will have their day in court in the forum of their choice—arbitration"); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 2020 WL 869980, at *5, *7 (D. Minn. Feb. 21, 2020) (preliminary approval order "set forth an orderly, efficient manner for class members to opt out and, thus, pursue parallel actions, including lawsuits and arbitrations, with little delay" and thus "if Movants do have a right to arbitrate, they can vindicate that right by opting out of the Settlement Class").

Courts also reject objections where the objectors had ample opportunity to opt out but failed to do so. *See Rescigno v. Statoil USA*

---

liability and damages issues, and potential appeals of rulings, in particular given the Parties' dispute over the mandatory arbitration and class action waiver provisions contained in Defendants' Customer Account Agreements.").

*Onshore Props. Inc.*, 2023 WL 145008, at *7 (M.D. Pa. Jan. 10, 2023) (granting final approval and noting that while "Objectors challenge the class action settlement, they have not opted-out of the settlement to proceed with individual arbitration," which was "puzzling… because they argue that individual arbitration is a viable and better option, **but are unwilling to proceed with this process on their own accord**" (emphasis added)).

Here, contrary to Udell's complaint that the Settlement "comes at the expense of customers who wish to rely on their contractual right to proceed individually," ECF 364 at 8, the Court's Preliminary Approval Order provides a clear path for those Settlement Class Members: submitting an opt-out request containing the information required by the Court. Thousands of Settlement Class Members chose this path, including dozens of Udell's other clients. Objectors' contention that the class Settlement was "forced" upon them is refuted by their opportunity to opt out of the Settlement and should not be credited. ECF 364 at 18.

More generally, there is no contradiction between agreeing to arbitrate and subsequently agreeing to a class settlement.[8] Arbitration is a matter of contract—that parties have agreed to arbitrate does not foreclose them from later agreeing to waive that procedure. *See Parker v. ABC Debt Relief Co.*, 2011 WL 13156874, at \*1 (N.D. Tex. Nov. 4, 2011) ("Arbitration is a contractual right, and therefore is subject to waiver."); *see also Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (describing "federal policy" of "treating arbitration contracts like all others," including by applying "ordinary procedural rule[s]—whether of waiver or forfeiture or what-have-you").

The Fifth Circuit has long observed that "the right to arbitration, like any contractual right, may be waived." *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1158 (5th Cir. 1986); *see also Fujimoto v. Rio Grande Pickle Co.*, 414 F.2d 648, 656 (5th Cir. 1969) ("It is well established that parties to a contract can, by mutual agreement, modify

---

[8]   Nor does agreeing to arbitrate and subsequently agreeing to a class settlement implicate the Rules Enabling Act (28 U.S.C. §2072). Udell cites no authority establishing that the Rules Enabling Act prevents parties from waiving contractual arbitration rights, nor can he. Indeed, Udell's own cases acknowledge that arbitration is "a matter of contract." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). Contrary to Udell's assertion, the *Italian Colors* court found that the Rules Enabling Act is "likely" implicated when arbitration agreements with class waivers are **invalidated by courts**—not when parties waive those rights. *Id.* at 234.

or rescind a contract and adopt in its stead a new agreement."
(quotation omitted)).

A federal court invoked this very principle when considering and
rejecting near-identical objections in another matter involving AT&T.
In *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789
F.Supp.2d 935 (N.D. Ill. 2011), the court granted final approval of a
class settlement, rejecting objections from "[a] small number of Class
Members object[ing] to the Settlement on the ground that it violates the
parties' contract" due to the arbitration agreement and class action
waiver. *Id*. at 976. The court held that though AT&T was "free to
attempt to enforce the arbitration provision against the Class
Representatives and other Class Members," the company "elected to
waive that right as part of the Settlement Agreement." *Id*. Likewise,
"Class Members also had the right to enforce the arbitration provision."
*Id*. "Those who agreed to the Settlement Agreement by not opting out,
agree—like AT&T—not to enforce that provision," while "Class
Members who wished to enforce their right to arbitration **could have
done so by opting out**." *Id*. (emphasis added). "Ultimately, the
objectors are mistaken in asserting that an arbitration agreement

26

prevents the parties to the same from ever reaching a subsequent agreement," because "parties to an arbitration agreement can always waive the agreement and decide to duke out their dispute in court." *Id.* (citations omitted).

Here too, AT&T and Settlement Class Members who did not opt out have agreed to waive their arbitration rights and to be bound by the Settlement Agreement. Accordingly, the Udell objectors' contentions are baseless.

## VII.  The Releases Are Valid And Fair.

Objectors raise various criticisms of the Releases in the Settlement Agreement. ECF 368, 379. None has merit.

**First**, Objectors argue any release should be limited to individuals who submit a claim for and receive payment. But it is sensible for settlements like this to release class member claims, whether or not they make claims or receive payment, so settling defendants are not threatened with serial litigation. Accordingly, courts in this Circuit and around the country routinely endorse such settlements. *See, e.g.*, *Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442, 452 (5th Cir. 2016) (holding plaintiffs "who did not file claim forms—and therefore, did not

27

receive any portion of the… settlement—cannot avoid the preclusive effect of their failure to opt out… simply because they did not receive a payment"); *Blackmon v. Zachary Holdings, Inc.*, 2022 WL 3142364, at *3 (W.D. Tex. Aug. 5, 2022) (approving class settlement where releases applied to all settlement class members "regardless of whether such Class Member receives a monetary benefit from the Settlement"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 343 (W.D. Tex. 2007) (similar); *Salinas v. U.S. Xpress Enters., Inc.*, 2018 WL 1477127, at *7 (E.D. Tenn. Mar. 8, 2018) ("Courts routinely approve settlements where class members who do not receive payments, either because they did not file a claim form or because they did not cash their check, release claims." (collecting cases)).

Objectors also argue recent filings from the Settlement Administrator suggest Documented Loss Cash Payment claims by AT&T 2 Class Members exceed $42 million—meaning Tier 3 Claimants will receive nothing from the Settlement and Documented Loss Cash Payment Claimants will receive less than half the value of their claims. But Objectors omit that Documented Loss Cash Payment claims must be validated by the Settlement Administrator and only **valid**

28

Documented Loss Cash Payment claims will be paid. Given the limited AT&T 2 Data Elements at issue—telephone numbers unassociated with other identifying information—AT&T anticipates the validation process will significantly reduce the Documented Loss Cash Payment claims for the AT&T 2 Settlement Class.

Objectors further argue the Releases are "impermissibly broad" because they include claims or theories not specifically asserted in the litigation. But it is routine for class settlements to release all claims that could be asserted in litigation, and equally routine for courts to enforce such releases. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint." (citation omitted)); *Davis v. CenturyLink, Inc.*, 2025 WL 1009556, at *6 (5th Cir. Apr. 4. 2025) (rejecting "meritless contention" that settlement "could not preclude claims under Texas state law" because court could "release the state claims even though those claims were not pending before it"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. at 311 (similar).

29

Objectors also assert the Settlement Agreement defines "Released Claims" broadly but does not use that definition when describing the "individual claims" preserved by those who opt-out. Objectors blatantly speculate this would allow AT&T to "suppress the rights of the Opt-Outs pursuing individual claims by arguing the only thing not released was the claims, but the remaining laundry list of rights were released." Objectors point to no evidence of such intent, nor cite a single example where comparable release language was deployed in such a way.

Finally, Objectors argue there is no consideration for the release of AT&T 2 Settlement Class claims against defendant Snowflake because it is not a party to the Settlement Agreement and not funding the Settlement. But the value of the Settlement Agreement represents the consideration for the Releases as a whole—including any release of claims against Snowflake. "[A] court may approve a class action settlement that releases non-parties if the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the" settling parties. *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 302 (5th Cir. 2017). There is good reason for this rule: "A defendant may be unlikely to settle a class

30

action if class members can later pursue unasserted claims, or claims against non-parties, that may have the effect of re-opening the litigation." *Id.*; *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632, 666-67 ("[A]lthough the release eliminates [objector's] right to bring claims against [non-parties] (who have paid nothing toward the proposed settlement)… the provision is essential to the viability of the proposed settlement" which "with the release included, is fair, reasonable, and adequate.").

Here, Objectors do not dispute that claims against Snowflake are "based on the same underlying factual predicate" as the claims against AT&T or that the failure to release claims against Snowflake could have "the effect of re-opening the litigation" against AT&T. *See Jones*, 865 F.3d at 302.

## VIII. Kristal Quarker's Objections Regarding A Putative "Power Imbalance" And Lack Of An Appeal Process Are Without Merit.

Objector Kristal Quarker claims that the Settlement "centralizes power in the hands of the Settlement Administrator, who operates without publicly disclosed standards, oversight, or a mechanism for appeal." ECF 321. Her Objection significantly overstates the Settlement

31

Administrator's role here and ignores meaningful protections for Settlement Class Members. The Settlement Agreement requires the Settlement Administrator to make only a minimal number of decisions with respect to Settlement Class Member claims. Contrary to her claim that the Settlement "centralizes power" in the Settlement Administrator, those decisions are subject to this Court's ultimate review.

## IX. Because Unclaimed Funds Will Not Revert To AT&T, Ms. Quarker's Objection Is Unfounded.

Kristal Quarker objects that the Settlement Notice is "silent on the fate of unclaimed funds," arguing that the Notice "does not clarify whether AT&T retains the remainder after claims" and asserts that "[u]nclaimed funds must not revert to AT&T under any scenario." ECF 321. Not so. The Settlement Agreement—which is available for review on the Settlement Website, as the Settlement Notice indicated— **expressly provides** that unclaimed funds will **not** revert to AT&T. *See* ECF 283-1 ("In the event there are funds remaining in the Settlement Funds… the Parties will confer regarding the appropriate distribution to be presented to the Court for approval. **Under no circumstances**

**shall any amount of the Settlement Funds revert back to**

**Defendants**.").

## Conclusion.

For the foregoing reasons, AT&T respectfully requests that the

Court overrule the Objections in their entirety.


Dated: December 18, 2025

/s/ *Gilbert S. Keteltas*
Gilbert S. Keteltas
BAKER HOSTETLER LLP
1050 Connecticut Ave., NW,
Suite 1100
Washington, DC 20036
Tel: (202) 861.1530
Fax: (202) 861.1783
Email: gketeltas@bakerlaw.com

C. Shawn Cleveland
Texas Bar No. 24012433
Tamara D. Baggett
Texas Bar No. 24058573
BAKER HOSTETLER LLP
2850 N. Harwood Street, Suite 1100
Dallas, TX 75201
Tel: (214) 210-1200
Fax: (214) 210-1201
Email: scleveland@bakerlaw.com
Email: tbaggett@bakerlaw.com

Michael W. McTigue Jr.
Meredith C. Slawe
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
michael.mctigue@skadden.com
meredith.slawe@skadden.com

Gregg J. Costa
GIBSON DUNN
811 Main St., Suite 3000
Houston, TX 77002
Tel: (346) 718.6649
Email: gcosta@gibsondunn.com

**ATTORNEYS FOR
DEFENDANT AT&T INC.**

34

## CERTIFICATE OF WORD COUNT

I hereby certify the word count for this filing (excluding case caption, table of contents, table of authorities, signature block, and certificates) is 6,128 words.

*/s/ Gilbert S. Keteltas*
Gilbert S. Keteltas

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2025, the foregoing was electronically filed and served via ECF.

*/s/ Gilbert S. Keteltas*
Gilbert S. Keteltas