# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| IN RE: AT&T INC. CUSTOMER DATA SECURITY BREACH LITIGATION | § § § § § § § § § § § | CASE NO. 3:24-cv-00757-E<br><br>MDL DOCKET NO. 3:24-md-03114-E |

## AT&T DEFENDANTS' POSITION ON ALL OPT-OUT REQUESTS

# TABLE OF CONTENTS

**Page**

Background..............................................................................................3

    A.    Opt-Out Requests Were Submitted By 9,543 Individuals On Or Before The Court's November 17, 2025 Opt-Out Deadline. ............................................3

    B.    Certain Firms that Threatened to Pursue Mass Arbitration Improperly Solicited Opt-Out Requests from Their Clients. ..................................................3

    C.    This Court Approved and Upheld the Opt-Out Requirements in the Parties' Settlement Agreement. ...........6

Argument.................................................................................................8

    A.    The Opt-Out Requirements Are Reasonable and Enforceable...............................................................9

    B.    AT&T Recommends that the Court Approve All Compliant Opt-Out Requests. ...........................12

    C.    The Court Should Reject Materially Deficient Opt-Out Requests. ..................................................12

    D.    The Court Should Require Counsel Who Procured Opt-Out Requests Through Misleading Communications to Issue Curative Notices. ........................................13

Conclusion. ............................................................................................18

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Bellows v. NCO Financial Systems, Inc.*,
No. 07-CV-1413 W (AJB), 2009 WL 10725745 (S.D. Cal. June
19, 2009) ................................................................. 10

*Braswell v. Bow Plumbing Group, Inc.*,
No. 2:21-cv-25-ECM, 2024 WL 2401782 (M.D. Ala. May 23,
2024) ....................................................................... 14

*Chalian v. CVS Pharmacy, Inc.*,
No. 2:16-cv-8979-AB-AGR, 2020 WL 7347866 (C.D. Cal. Oct.
30, 2020) ................................................................. 16

*In re Deepwater Horizon*,
No. 30617, 2021 WL 3501651 (5th Cir. Aug. 9, 2021) ............... 8, 10

*In re Diet Drugs*,
282 F.3d 220 (3d Cir. 2002) ........................................ 12

*Georgine v. Amchem Products, Inc.*,
160 F.R.D. 478 (E.D. Pa. 1995) .................................... 15

*Hallie v. Wells Fargo Bank, N.A.*,
No. 2:12-cv-00235-PPS-APR, 2015 WL 1914864 (N.D. Ind.
Apr. 27, 2015) ......................................................... 10

*In re Kitec Plumbing System Products Liability Litigation*,
No. 09-md-2098, 2011 WL 13289881 (N.D. Tex. Oct. 27,
2011) ....................................................................... 13

*In re Lease Oil Antitrust Litigation (No. II)*,
186 F.R.D. 403 (S.D. Tex. 1999) ................................... 15

*Matson v. NIBCO Inc.*,
No. 5-19-CV-00717-RBF, 2021 WL 2374312 (W.D. Tex. June
10, 2021) .......................................................... 14, 16, 17

*Moulton v. United States Steel Corp.*,
　　581 F.3d 344 (6th Cir. 2009) .......................................................... 10

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
　　910 F.Supp.2d 891 (E.D. La. 2012) ................................................ 13

*Rossini v. Ogilvy & Mather, Inc.*,
　　798 F.2d 590 (2d Cir. 1986) ............................................................ 15

*Stark v. Patreon, Inc.*,
　　No. 22-cv-03131-JCS, 2025 WL 1592736 (N.D. Cal. June 5, 2025) ................................................................................................ 15

*In re Syngenta AG Mir162 Corn Litigation*,
　　No. 20-cv-2168-JWL-JPO, 2021 WL 3025471 (D. Kan. May 14, 2021) ....................................................................................... 10

*In re TikTok, Inc., Consumer Privacy Litigation*,
　　565 F.Supp.3d 1076 (N.D. Ill. 2021) .............................................. 10

**OTHER AUTHORITIES**

Letter from Chris Carr, Georgia Attorney General, to JAMS, American Arbitration Association, and National Arbitration and Mediation (Dec. 1, 2025), *available at* https://law.georgia.gov/press-releases/2025-12-08/carr-sends-warning-arbitration-organizations-accused-abusive-practices ..... 11

Michael W. McTigue Jr. & Meredith C. Slawe, *Private Power, Public Harm: The Coercive Dynamics of Mass Arbitration*, U.S. Chamber of Commerce Inst. For Legal Reform (Dec. 2025) ........................................................................................... 11

As the Court is aware, millions of Settlement Class Members across the country have submitted Claim Forms to participate in the Settlement, while just 9,606 requests to opt out of the Settlement were submitted.[1]

The Settlement Administrator, Kroll Settlement Administration LLC ("Kroll"), identified 6,803 opt-out requests that do not comply with one or more of the requirements in the Court's Preliminary Approval Order, and identified 2,803 timely opt-out requests that comply with the requirements in the Court's Preliminary Approval Order. There is evidence, however, that 2,333 of the 2,803 opt-out requests that complied with the Court's Preliminary Approval Order were obtained improperly by counsel who provided Settlement Class Members with incomplete or misleading information to induce them to opt out of the Settlement.

AT&T's position on the opt-out requests is as follows:

- AT&T has no objection to the Court accepting the 470 timely and compliant opt-out requests identified in Exhibit A to the Kroll

---

[1]  "AT&T" refers to Defendants AT&T Inc., AT&T Corporation and AT&T Mobility LLC. Other capitalized terms have the meanings set forth in the Settlement Agreement. *See* ECF 283-1. "McTigue Decl." refers to the Declaration of Michael W. McTigue Jr. filed herewith and "Kroll Decl." or "Kroll Declaration" refers to the Declaration of Jeanne C. Finnegan of Kroll Settlement Administration filed herewith.

Declaration.

- The Court should reject the 6,803 opt-out requests identified in Exhibit B to the Kroll Declaration that were untimely or otherwise did not comply with one or more of the Preliminary Approval Order's requirements.

- The Court should conditionally invalidate the remaining 2,333 opt-out requests identified in Exhibit C to the Kroll Declaration, which were obtained improperly by counsel based on incomplete or misleading information but were otherwise compliant. To ensure those individuals have the opportunity to make informed decisions regarding whether to participate in or opt out of the Settlement, AT&T respectfully asks the Court to (1) authorize Kroll to send Court-approved curative notices to that limited group of individuals within fourteen days of the Court's Final Approval Order, and (2) re-open the opt-out and Claim Form deadline for those individuals for a period of twenty-one days from the curative notice date.

## Background.

**A.    Opt-Out Requests Were Submitted By 9,543 Individuals On Or Before The Court's November 17, 2025 Opt-Out Deadline.**

In total, 9,606 opt-out requests[2] were received by Kroll, 9,543 of which were submitted on or before November 17, 2025. Kroll Decl. ¶4. More than 90% of those timely opt-out requests—8,789 out of 9,543— were submitted by counsel who have threatened to pursue mass arbitrations on behalf of their purported clients. The firms primarily responsible for these opt-out requests include the Swigart Law Group ("Swigart") (6,010), Potter Handy, LLP ("Potter Handy") (1,609), and Harrer Law, P.C. ("Harrer") (1,194).[3] McTigue Decl. ¶3.

**B.    Certain Firms that Threatened to Pursue Mass Arbitration Improperly Solicited Opt-Out Requests from Their Clients.**

Following AT&T's March 30, 2024 and July 12, 2024 announcements of data incidents (the "Data Incidents"), Harrer (through its predecessor firm, Chicago Consumer Law Center, P.C.) and Potter

---

[2]    These opt-out requests include the submissions docketed at ECF numbers 396, 401, 402, 404, 408, 409, 412, 440, and 444, which Kroll analyzed for compliance and categorized into the corresponding exhibits.

[3]    These firms submitted numerous duplicative opt-out requests. The figures shown here exclude any duplicate submissions. Kroll Decl. ¶4.

3

Handy (and its co-counsel Biz Head Law LLC) launched advertising campaigns to solicit consumer claimants to pursue mass arbitrations. McTigue Decl. ¶2. Many of the claimants solicited by those firms were not AT&T customers or were AT&T customers not involved in the Data Incidents. *Id.*

Following the Preliminary Approval Order, these firms shifted tactics and began soliciting opt-out requests *en masse*. But like their mass arbitration efforts, many of those opt-out solicitations were inaccurate or failed to otherwise secure valid opt-out requests.

**Potter Handy**. Potter Handy submitted 1,609 opt-out requests on what appears to be a firm-created form. McTigue Decl. ¶4. In September 2025, a social media user publicly posted an email communication from Potter Handy to its clients that revealed how the firm solicited these opt-out requests. Potter Handy's email falsely suggested that the only way consumers could "continue with" claims against AT&T would be to "print the attached document, sign it, and mail it back" to facilitate the firm's submission of an opt-out request on their behalf. McTigue Decl. Ex. 1. The email "**encourage[d]**" consumers to opt-out so they could "maintain [their] right to bring a **lawsuit** against AT&T for their violations." *Id.*

(emphases added). Potter Handy appeared to conceal its intent to pursue **arbitrations** against AT&T, not litigation, stating that clients who opt-out will be represented by the firm "through the **litigation process**." *Id.* (emphasis added). Indeed, one consumer stated the firm was "encouraging you to drop out of the 'class action' suit so they can represent you in a direct litigation suit." *Id.*

**Harrer**. Harrer submitted 1,194 opt-out requests, also on a form seemingly created by the firm. Some opt-out requests submitted by Harrer included statements suggesting that Harrer misled them about the benefits conferred under the Settlement Agreement to induce them to opt out. For example, two opt-out requests reference a "$2.50 settlement," even though the Settlement Agreement does not provide for such a settlement amount. *See* McTigue Decl. Ex. 2 at 1 (requesting to "opt out of the less than $2.50 settlement only"); *id.* at 2 (stating "[w]e should be compensated way more than a lousy $2.50").

On November 20, 2025, counsel for AT&T wrote to Harrer, noting that "some of your purported clients' opt out requests suggest that your solicitations might have falsely represented the relief available to settlement class members." *See* McTigue Decl. Ex. 3 at 1. AT&T

requested Harrer preserve all communications with putative Settlement Class Members regarding the pending settlement and reserved all rights. *Id.* at 2. To date, Harrer has not responded.

The opt-out requests submitted by Potter Handy and Harrer contained severe deficiencies that confirm these firms' opt-out solicitations confused consumers, including requests from individuals who:

- previously released their claims against AT&T;

- separately submitted a Claim Form seeking compensation from the Settlement;

- do not appear to be members of either Settlement Class;

- submitted blank or incomplete forms;

- separately submitted an opt-out request through a different law firm, which request was also deficient;

- did not sign the request; or

- submitted untimely requests.

McTigue Decl. ¶¶4, 6.

## C.    This Court Approved and Upheld the Opt-Out Requirements in the Parties' Settlement Agreement.

On June 20, 2025, this Court preliminarily approved the Class Action Settlement Agreement and Release and entered a Preliminary

Approval Order setting forth the requirements for any Settlement Class Members to opt out of the Settlement Class. To opt out, Settlement Class Members had to provide their name, address, all AT&T telephone numbers (and their current number), email address, the identification of their counsel, if represented, and for former AT&T customers, their AT&T account number(s) or an attestation they cannot obtain their AT&T account number(s). ECF 298 ¶15. The Court also required a "handwritten 'wet' signature" and "a statement clearly indicating the individual wishes to be excluded from a Settlement Class for the purposes of the Settlement." *Id*.

On July 30, 2025, counsel seeking to pursue mass arbitrations against AT&T sought an emergency stay of the Settlement, arguing the opt-out requirements were overly burdensome for their purported clients. ECF 305. This Court disagreed, concluding that "the types of limitations that Claimants challenge" are "appropriate to guard against collusion and ensure that individual circumstances can be considered." ECF 336, at 5. The Court reasoned: "As the Fifth Circuit recognized almost a decade ago, an individual opt-out requirement of precisely the type in the preliminary approval order here is a 'common and practical requirement'

that falls within this Court's 'especially strong and flexible managerial power in this highly complex MDL.'" *Id.* at 4 (quoting *In re Deepwater Horizon*, 819 F.3d 190, 197-98 (5th Cir. 2016)).

The Court's concerns that led to the implementation of individualized opt-out requirements, including handwritten "wet" signatures, were proved valid by certain submissions in this case. For example, on November 12, 2025, Kroll received 6,010 electronically-signed opt-out requests from Swigart. At least six of those requests were submitted on behalf of Settlement Class Members who had **died** before Kroll received the requests. McTigue Decl. Exs. 4-9; Kroll Decl. Exs. D-I. In fact, three of the Swigart opt-out requests were purportedly electronically signed **after** the claimant's date of death, according to the individual's obituary. McTigue Decl. Exs. 4, 6, 7; Kroll Decl. Exs. D, F, G.

## Argument.

In its Preliminary Approval Order, this Court identified the specific requirements for individuals seeking to opt-out of the Settlement. ECF 298 ¶15. AT&T has no objection to the Court accepting the 470 opt-out requests that complied with those requirements.

An additional 6,803 opt-out requests are noncompliant because they violate one or more of the requirements set forth by the Court in its Preliminary Approval Order. Those opt-out requests should be rejected.

The remaining 2,333 opt-out requests that are facially compliant should be conditionally invalidated because there is sufficient evidence that they were induced to opt-out with incomplete or misleading information by Potter Handy and Harrer. Accordingly, these requested opt-outs should be invalidated, but the Settlement Class Member should be given a chance to either participate in the Settlement or provide a valid opt-out after a curative notice. Without impeding Final Approval of the Settlement, AT&T respectfully requests that the Court (1) authorize Kroll to send Court-approved curative notices to that limited group of individuals within fourteen days of the Court's Final Approval Order, and (2) re-open the opt-out and Claim Form deadline for a period of twenty-one days from the curative notice date for those individuals only.

### A.    The Opt-Out Requirements Are Reasonable and Enforceable.

As this Court has already recognized, the Settlement's opt-out requirements—including handwritten ("wet ink") signatures—are commonplace and routinely approved. ECF 336, at 4; *see also In re*

9

*Deepwater Horizon*, 2021 WL 3501651, at *2 (5th Cir. Aug. 9, 2021) (because "the MSA required [class member] to sign the form personally in wet ink" and "he indisputably did not," district court "was correct to conclude that [class member's] opt-out form was deficient"); *In re Syngenta AG Mir162 Corn Litig.*, 2021 WL 3025471, at *10 (D. Kan. May 14, 2021) (a "handwritten, wet ink signature provided assurance that all potential [c]lass [m]embers, whether represented or not, would exercise their opt-out rights only after personally evaluating the pros and cons of doing so").[4]

Such individualized opt-out procedures are particularly appropriate here because there is a serious risk that counsel seeking to pursue parallel mass arbitrations are attempting to opt-out their clients without authorization or an informed decision-making process. *See In re TikTok, Inc., Consumer Privacy Litig.*, 565 F.Supp.3d 1076, 1092-93

---

[4]    *See also Hallie v. Wells Fargo Bank, N.A.*, 2015 WL 1914864, at *4 (N.D. Ind. Apr. 27, 2015) (describing "personal signature requirement" as "a standard requirement in class actions, and… not onerous"); *Bellows v. NCO Fin. Sys., Inc.*, 2009 WL 10725745, at *4 (S.D. Cal. June 19, 2009), (signature requirement "with identifying information is unburdensome and insures that potential class members knowingly act with the intent to exclude themselves from the class action settlement," "protect[ing] against abuses by an attorney who without authority seeks to improperly interfere with a class action settlement"); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 355 (6th Cir. 2009) ("Given the real risk that the attorney-signed opt-out forms did not reflect the wishes of class members, the district court appropriately exercised its power by requiring individually signed opt-out forms (and rejecting the attorney-signed forms).").

(N.D. Ill. 2021) (rejecting objection challenging individualized opt-out requirements made by counsel pursuing parallel mass arbitration because such requirements, including individual signatures, are "'vital' to ensuring" class members are "individually consenting to opt out" and noting "courts have routinely enforced the requirement that class members individually sign and return a paper opt-out form").[5]

As shown above, the need for such requirements was demonstrated by the Swigart firm, for example, which submitted opt-out requests purportedly e-signed by individuals after their deaths. McTigue Decl. Exs. 4, 6, 7; Kroll Decl. Exs. D, F, G. The opt-out requirements are also warranted in light of the evidence presented above that some firms have

---

[5]  Tactics employed by firms seeking to bring mass arbitrations often raise serious consumer protection issues, including misleading solicitations and claims brought without client authorization or awareness. *See* Michael W. McTigue Jr. & Meredith C. Slawe, *Private Power, Public Harm: The Coercive Dynamics of Mass Arbitration*, U.S. Chamber of Commerce Inst. For Legal Reform 17-18 (Dec. 2025) ("consumer protection concerns that pervade modern mass arbitration solicitation practices, and the attendant ethical issues inherent in these practices, are serious and warrant close attention"); *id.* at 35 ("[C]laimants who sign up for mass arbitrations may be unaware at the intake stage, or indeed at any point, which law firm (or set of firms) will be representing them They may not know that they are represented at all."); Letter from Georgia Attorney General Chris Carr to JAMS, American Arbitration Association, and National Arbitration and Mediation (Dec. 1, 2025), *available at* https://law.georgia.gov/press-releases/2025-12-08/carr-sends-warning-arbitration-organizations-accused-abusive-practices (raising concerns about mass arbitration practices including "situations in which law firms [] purport to represent consumers who… thought they were signing up for a class action, not an arbitration; are already represented by another firm in a separate proceeding involving the very same claim; are not even party to the underlying arbitration agreement and have not engaged in a transaction giving rise to the claim").

provided Settlement Class Members with inaccurate and misleading information.

Finally, any objection that the opt-out requirements are burdensome is disproven by the fact that **hundreds** of individuals submitted compliant opt-out requests.

### B. AT&T Recommends that the Court Approve All Compliant Opt-Out Requests.

AT&T recommends that the Court approve the 470 opt-out requests identified in Exhibit A to the Kroll Declaration, as they complied with the requirements detailed in the Court's Preliminary Approval Order. *See* ECF 298 ¶15. *In re Diet Drugs*, 282 F.3d 220, 241 (3d Cir. 2002) (district court has "indisputable authority to determine the opt-out rules for the plaintiff class before it, and to determine who had properly opted out under those rules").

### C. The Court Should Reject Materially Deficient Opt-Out Requests.

The 6,803 individuals listed on Exhibit B to the Kroll Declaration submitted opt-out requests that Kroll determined did not comply with each requirement in the Court's Preliminary Approval Order or were untimely. AT&T recommends that the Court reject the opt-out requests

contained in Exhibit B to the Kroll Declaration, meaning those individuals will remain Settlement Class Members and be bound by the Settlement terms, including the Releases. *See, e.g.*, *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F.Supp.2d 891, 937 (E.D. La. 2012) (opt-out requirements are "common and routinely enforced"); *In re Kitec Plumbing Sys. Prods. Liab. Litig.*, 2011 WL 13289881, at *4 (N.D. Tex. Oct. 27, 2011) (Furgeson, J.) ("Because the Insurers' contested opt-outs fail to provide the basic information required by the Settlement Agreement, they are invalid and must [be] stricken.").

### D. The Court Should Require Counsel Who Procured Opt-Out Requests Through Misleading Communications to Issue Curative Notices.

As shown above, AT&T's review of publicly available communications and opt-out requests indicate Harrer and Potter Handy likely misled individuals about the settlement when soliciting opt-outs, thereby preventing them from making informed decisions about participating or opting out of the Settlement. *Supra* at 3-6. Many of those opt-out requests were also non-compliant and are included in Exhibit B to the Kroll Declaration for rejection. But for the 2,333 opt-out requests

13

identified in Exhibit C to the Kroll Declaration that were submitted in response to those misleading communications from Harrer (1,078 requests) and Potter Handy (1,255 requests) and otherwise complied with the Court's requirements, the Court should conditionally invalidate those requests and require corrective notice to be issued.

Courts evaluate communications with class members that could undermine the court-approved notice plan and will invalidate opt-out requests procured by misleading, coercive communications. *See Matson v. NIBCO Inc.*, 2021 WL 2374312, at *5-8 (W.D. Tex. June 10, 2021) (invalidating over 400 opt-out requests, requiring curative notice, and re-opening the opt-out period for "affected class members" following "misleading, coercive, and factually inaccurate letters" sent by counsel that "mischaracterize[d] the settlement" by falsely stating that the payment to each class member would be "less than $1,000"); *Braswell v. Bow Plumbing Grp., Inc.*, 2024 WL 2401782, at *2-3 (M.D. Ala. May 23, 2024) (striking 319 opt-out requests and requiring "additional curative notice" and "a new opportunity to opt out of the settlement class" where counsel had "undermined… the integrity of the class settlement process by providing incomplete, misleading, and coercive information to

14

potential class members"); *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 497 (E.D. Pa. 1995) (striking opt outs and finding that counsel's communications urging class members to opt out of the settlement "undermined the spirit of the notice plan approved by this Court" and that "[t]he misleading, coercive and overzealous communications with the class have frustrated this Court's purposes and likely have created fear and confusion among class members"); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 602 (2d Cir. 1986) (upholding order restricting communications between parties and potential class members where, *inter alia*, one of the parties circulated a questionnaire to potential class members that "posed the dangers of possible chilling of the rights of the potential class members **or seeming to pressure any of them unduly to opt out of the class** or **creating confusion**, and threatened the essence of fairness and due process" (internal alterations omitted) (emphasis added) (citation omitted)).[6]

---

[6]     *See also Stark v. Patreon, Inc.*, 2025 WL 1592736, at *6, *15-16 (N.D. Cal. June 5, 2025) (invalidating opt-outs after company offered class members purportedly a "better deal" than the settlement and failed to inform class members of certain rights under the settlement agreement, and allowing opportunity to opt-out or submit a claim); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 442 (S.D. Tex. 1999) (voiding effect of all opt-out requests submitted by counsel upon finding that counsel's communications to absent class members "misstated the legal options available to the recipients, and it omitted important facts about the Global Settlement and about [the attorney's] pecuniary

*(cont'd)*

Here, the opt-out requests submitted directly by Harrer indicate it provided misleading information that "mischaracterizes the settlement." *Matson*, 2021 WL 2374312, at *5. Harrer appears to have misled its purported clients to believe they stood to gain only "$2.50" by participating in the Settlement, which directly contradicts the Settlement Agreement and the Court-approved Notices and Claim Forms distributed to the Settlement Classes. *See supra* at 5; Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Applications for Attorneys' Fees, Costs, and Service Awards with Incorporated Memorandum of Law, ECF 356, at 10-12 (describing class member benefits, including up to $5,000 Documented Loss Cash Payments for the AT&T 1 Settlement Class, up to $2,500 Documented Loss Cash Payments for the AT&T 2 Settlement Class, and alternative tiered Cash Payments, subject to *pro rata* adjustments).

Similarly, Potter Handy's opt-out solicitations misled its clients into believing that the firm would "bring a **lawsuit** against AT&T for

---

interests"); *Chalian v. CVS Pharmacy, Inc.*, 2020 WL 7347866, at *3-4 (C.D. Cal. Oct. 30, 2020) (granting temporary restraining order and ordering a plaintiff's firm to cease communication with settlement class members after finding its misleading communications "threaten[ed] to cause imminent harms" to potential plaintiffs who may "relinquish valuable settlements based on such misleading information").

their violations" and proceed "through the **litigation process**," concealing its intent to pursue **arbitration** against AT&T. McTigue Decl. Ex. 1. Social media commentary confirms that individuals were in fact misled by such communications. *Id.* (one consumer stating the firm was "encouraging you to drop out of the 'class action' suit so they can represent you in a direct litigation suit").

Accordingly, the Court should conditionally invalidate the opt-out requests submitted by Harrer and Potter Handy identified in Exhibit C to the Kroll Declaration. But this limited subset of potential Settlement Class Members should not be foreclosed from making an informed decision regarding their participation in the Settlement, including by submitting a Claim Form. The Court can instead authorize Kroll to provide curative notice to those Settlement Class Members and re-open the opt-out period for a reasonable period of time to allow affected individuals to submit a Claim Form or a valid opt-out request. *See Matson*, 2021 WL 2374312, at *8 ("[I]f these class members did, in fact, make a free and unfettered decision in choosing to withdraw, then they will do so again during the re-opened opt-out period." (citation omitted)).

Without impeding Final Approval of the Settlement, AT&T

17

respectfully requests that the Court:

(1)    authorize Kroll to send Court-approved curative notices substantially in the form of the attached **Exhibit 1** within fourteen days of the Court's Final Approval Order to the 2,333 individuals on Exhibit C to the Kroll Declaration who submitted otherwise compliant opt-out requests through Harrer and Potter Handy; and

(2)    re-open the opt-out and Claim Form deadline for the individuals listed in Exhibit C to the Kroll Declaration for a period of twenty-one days from the curative notice date.

### Conclusion.

For the foregoing reasons, the Court should accept the compliant opt-out requests in Exhibit A to the Kroll Declaration and invalidate the non-compliant opt-out requests in Exhibit B to the Kroll Declaration. The Court should further conditionally invalidate the opt-out requests for the individuals in Exhibit C to the Kroll Declaration, but authorize Kroll to send Court-approved curative notices substantially in the form of the attached **Exhibit 1** within fourteen days of the Court's Final Approval Order to those individuals and re-open the opt-out and Claim Form

18

deadline for a period of twenty-one days from the curative notice date for

that limited subset of Settlement Class Members.

                         Respectfully submitted,

Dated: February 20, 2026

                         */s/ Gilbert S. Keteltas*
                         Gilbert S. Keteltas
                         BAKER HOSTETLER LLP
                         1050 Connecticut Ave., NW,
                         Suite 1100
                         Washington, DC 20036
                         Tel: (202) 861.1530
                         Fax: (202) 861.1783
                         Email: gketeltas@bakerlaw.com

                         Michael W. McTigue Jr.
                         Meredith C. Slawe
                         SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM LLP
                         One Manhattan West
                         New York, NY 10001
                         Tel: (212) 735-3000
                         Fax: (212) 735-2000
                         michael.mctigue@skadden.com
                         meredith.slawe@skadden.com

C. Shawn Cleveland
Texas Bar No. 24012433
Tamara D. Baggett
Texas Bar No. 24058573
BAKER HOSTETLER LLP
2850 N. Harwood Street, Suite 1100
Dallas, TX 75201
Tel: (214) 210-1200
Fax: (214) 210-1201
Email: scleveland@bakerlaw.com
Email: tbaggett@bakerlaw.com

Gregg J. Costa
GIBSON DUNN
811 Main St., Suite 3000
Houston, TX 77002
Tel: (346) 718.6649
Email: gcosta@gibsondunn.com

**ATTORNEYS FOR
DEFENDANT AT&T INC.**

## CERTIFICATE OF WORD COUNT

I hereby certify the word count for this filing (excluding case caption, table of contents, table of authorities, signature block, and certificates) is 3,656 words.

/s/ *Gilbert S. Keteltas*
Gilbert S. Keteltas

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, the foregoing was

electronically filed and served via ECF.

*/s/ Gilbert S. Keteltas*
Gilbert S. Keteltas