March 19, 2026

United States District Court
Northern District of Texas

Honorable Judge Ada E. Brown

**Re:** In re AT&T Inc. Customer Data Security Breach Litigation
MDL No. 3:24-md-03114-E



Dear Judge Brown,

I respectfully submit this request for the Court to accept my opt-out from the class settlement under the doctrine of excusable neglect and in the interest of justice.

I previously submitted an opt-out request, which was entered on the docket as Item 409. That submission was postmarked December 19, 2025, one day after the stated deadline of December 18, 2025, and was rejected by AT&T solely on that basis.

However, the delay was caused by circumstances outside of my control.

In 2025, the United States Postal Service changed its postmark procedures such that postmarks may reflect the date of processing rather than the date of deposit. As a result, the postmark date is no longer a reliable indicator of when a document was mailed.

In an effort to comply with the deadline and ensure timely delivery, I utilized FedEx Standard Overnight service on December 17, 2025, a premium service recommended by USPS for time-sensitive and verifiable delivery. However, FedEx does not deliver to P.O. Boxes requiring a signature, and the settlement administrator provided only a P.O. Box address for submission of opt-out requests.

This created a situation where compliance with both the deadline and delivery requirements was not reasonably achievable. Despite taking additional steps to ensure timely and verifiable delivery prior to the deadline, my submission was delayed due to these logistical constraints.

I acted in good faith and made every reasonable effort to comply with the Court's deadline. The delay was minimal (one day) and did not prejudice any party.

I respectfully request that the Court accept my opt-out under Rule 6(b)(1)(B) based on excusable neglect, for the limited purpose of preserving my right to pursue any individual claims. I do not seek any monetary benefit from the settlement.

Thank you for your consideration.

Respectfully submitted,

Jonathan F. King
39190 Channel Drive
Cathedral City, CA 92234
(760) 774-2821

24 hours' notice was given. Vessels able to pass underneath the bridge in the closed position will be able to transit. Upon completion of design and construction of the new bridge, the Coast Guard may propose a new drawbridge operating schedule, as needed.

## V. Regulatory Analyses

We developed this rule after considering numerous statutes and Executive Orders related to rulemaking. Below we summarize our analyses based on a number of these statutes and Executive Orders.

### A. Impact on Small Entities

The regulatory flexibility analysis provisions of the Regulatory Flexibility Act of 1980, 5 U.S.C. 601–612, do not apply to rules that are not subject to notice and comment. Because the Coast Guard has, for good cause, waived the notice and comment requirement that would otherwise apply to this rulemaking, the Regulatory Flexibility Act's flexibility analysis provisions do not apply here.

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), if this rule will affect your small business, organization, or governmental jurisdiction and you have questions, contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

Small businesses may send comments to the Small Business and Agriculture Regulatory Enforcement Ombudsman and the Regional Small Business Regulatory Fairness Boards by calling 1–888–REG–FAIR (1–888–734–3247). The Coast Guard will not retaliate against small entities that question or complain about this rule or any policy or action of the Coast Guard.

### B. Collection of Information

This rule calls for no new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

### C. Federalism and Indian Tribal Government

A rule has implications for federalism under Executive Order 13132, Federalism, if it has a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. We have analyzed this rule under that Order and have determined that it is consistent with the fundamental federalism principles and preemption requirements described in Executive Order 13132.

Also, this rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

### D. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

### E. Environment

We have analyzed this rule under Department of Homeland Security Management Directive 023–01, Rev.1, associated implementing instructions, and Environmental Planning Policy COMDTINST 5090.1 (series) which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321–4370f). The Coast Guard has determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This rule promulgates the operating regulations or procedures for drawbridges and is categorically excluded from further review, under paragraph L49, of Appendix A, Table 1 of DHS Instruction Manual 023–01–001–01, Rev. 1.

Neither a Record of Environmental Consideration nor a Memorandum for the Record are required for this rule.

## List of Subjects in 33 CFR Part 117

Bridges.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 117 as follows:

## PART 117—DRAWBRIDGE OPERATION REGULATIONS

1. The authority citation for part 117 continues to read as follows:

**Authority:** 33 U.S.C. 499; 33 CFR 1.05–1; and DHS Delegation No. 00170.1, Revision No. 01.3

■ 2. Revise and republish § 117.588 to read as follows:

### § 117.588   Bass River.

The Hall Whitaker Bridge, mile 0.6 at Beverly, shall operate as follows:

(a) Public vessels of the United States with proper clearance must be passed as soon as possible.

(b) The owners of this bridge shall provide and keep in good legible condition clearance gauges for each draw with figures not less than 12 inches high designed, installed and maintained according to the provisions of § 118.160 of this chapter.

(c) The drawspan for the Hall Whitaker Drawbridge will remain in the closed to navigation position.

**M.E. Platt,**
*Rear Admiral, U.S. Coast Guard, Commander, Northeast Coast Guard District.*

[FR Doc. 2025–20726 Filed 11–21–25; 8:45 am]

**BILLING CODE 9110–04–P**

---

## POSTAL SERVICE

### 39 CFR Part 111

### Postmarks and Postal Possession

**AGENCY:** Postal Service.

**ACTION:** Final rule.

---

**SUMMARY:** The Postal Service is adding section 608.11, "Postmarks and Postal Possession," to the Domestic Mail Manual (DMM). This new section defines postmarks, identifies the types of Postal Service markings that qualify as postmarks, and describes the circumstances under which those markings are applied. It also advises customers of how to obtain evidence of the date on which the Postal Service accepts possession of their mailings. This new language in the DMM does not change any existing postal operations or postmarking practices, but is instead intended to improve public understanding of postmarks and their relationship to the date of mailing.

**DATES:** Effective December 24, 2025.

**FOR FURTHER INFORMATION CONTACT:** Martha Johnson, Senior Public Relations Representative, at *martha.s.johnson@ usps.gov* or (202) 268–2000.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Introduction
II. Comments
III. Response to Comments
IV. Explanation of Final Rules

### I. Introduction

On August 12, 2025, the Postal Service published a proposed rule in the **Federal Register**, Postmarks and Postal Possession, 90 FR 38716 (Aug. 11, 2025)

applied—will contain a date that does not align with the date on which the Postal Service first accepted possession of the mailpiece. RTO was the subject of an earlier rulemaking (90 FR 10857) and separate proceedings before the Postal Regulatory Commission (PRC Docket No. N2024–1). The Proposed Rule here is intended to define the postmark and inform the public of its meaning and operational uses. While the need for such clarification is due in part to RTO's changes to transportation and processing schedules, which will enable the Postal Service to significantly increase our operational efficiency and reduce costs, thereby supporting our efforts to continue to provide universal postal services in a financially self-sufficient manner, as the law requires, neither RTO nor any other initiative within the DFA plan are themselves the subject of this Proposed Rule.

• *Postal Service Funding.* One comment urges: "It's essential that the USPS be funded at a level that maintains the service on which we rely." As an initial matter, the Postal Service, by statute, is designed to be self-funded and self-sufficient. The Postal Service generally receives no tax dollars for operating expenses and relies on the sale of postage, products and services to fund its operations. To the extent this comment is recommending legislative changes, such recommendations are beyond the scope of this rulemaking and the Postal Service's authority. Moreover, while certain operational initiatives discussed in the Proposed Rule (*e.g.,* RTO) are designed to promote financial sustainability, such initiatives do not themselves fall within the scope of the present rulemaking, which is, as noted, confined to the postmark. Finally, as explained in the Notice of Proposed Rulemaking, the postmark is not, and never has been, a *service,* but has always performed functions (*e.g.,* cancelling postage) internal to the Postal Service operations.

Other comments betray factual misapprehensions that, while not addressed in the discussion below, warrant correction. According to one comment, voters will be required to "pay extra" for expedited handling of Ballot Mail. However, this Proposed Rule does not change the handing of Ballot Mail or any other mail, but simply clarifies the meaning of the postmark. Nor is it correct that, as predicted by other comments, current postmarks will be supplanted by new (and substantially different) postmarks, replaced in some way by notices that Postal Service has possession of a mailpiece, or eliminated in their

entirety. As noted, DMM Section 608.11 seeks to define the postmark as it presently exists, not to change it, and certainly not to eliminate it. To reiterate, postmarks will continue to be applied to Single-Piece First-Class Mail, both letter-shaped and flat-shaped, in the same manner and to the same extent as before.

All remaining comments within scope of this proceeding are addressed below.

### III. Response to Comments

#### A. Issues and Concerns

Some comments commend the Proposed Rule for the clarity and transparency it imparts. One observes that proposed DMM Section 608.11 "clearly defines and codifies the role of the postmark." Another "applaud[s] the Postal Service's formalization and coalescence of existing policies and understandings regarding postmarks into a single uniform rule," noting that "[t]his will provide greater clarity and authority regarding the meaning of a postmark. . . ." The Postal Service appreciates these comments, as they acknowledge the intent behind the Proposed Rule: not to diminish or supplant the postmark, but to clarify its meaning, such that customers better understand what it is and the purposes for which it may be relied upon.

Most comments adopt a more critical posture, but those comments generally misapprehend the current meaning of the postmark and the purpose of this rulemaking. One expresses concern with the perceived impetus behind the Proposed Rule: namely, to "move the public and customers away from viewing the postmark as a definitive date" on which a mailpiece was "received by the [Postal Service]." As explained in the Proposed Rule, postmarks applied at originating processing facilities have never provided a perfectly reliable indicator of the date on which the Postal Service first accepted possession of a mailpiece, and this fact will become more common under RTO. Therefore, to the extent that customers currently have this view of the postmark, it does not reflect the realities of postal operations. The purpose of DMM Section 608.11, and our forthcoming education efforts, is to make the actual meaning of the postmark more widely known, so that customers who may currently lack a clear understanding of the postmark can, if necessary, make adjustments to their mailing behavior—for example, by dispatching their mailings earlier, obtaining a manual (local) postmark at a retail location at no additional cost, or purchasing a Certificate of Mailing.

However, to suggest (in the words of one form letter) that "this proposal quietly ends any meaningful reliability of a postmark as indicia or proof of mailing" is completely inaccurate, given that DMM Section 608.11 plainly states, "[t]he presence of a postmark confirms that the Postal Service accepted custody of a mailpiece, and that the mailpiece was in the possession of the Postal Service on the identified date."

Some comments urge the Postal Service not to "implement" the "policies" described by the Proposed Rule, which also stems from a misunderstanding of DMM Section 608.11's nature and scope. These comments appear to assume that adoption of this DMM provision will prompt operational changes in how the postmark is applied, thereby altering the quality of information that postmarks as such convey. One comment, for instance, criticizes what it claims to be "the proposed changes to eliminate same-day postmarks." This comment ignores, however, that "same-day postmarks" (*i.e.,* postmarks bearing dates that align with the date on which the Postal Service first accepted possession of a mailpiece) will in many instances continue to be applied through automation and will remain available in all cases upon request at the retail counter. Meanwhile, multiple others perceive in the Proposed Rule an attempt to "devalue" the traditional postmark, and/or to "dilute" (or even "destroy") its alleged status as proof of the date that the Postal Service first accepted possession of a mailpiece. Yet to reiterate, the Proposed Rule aims to clarify the meaning and value of the postmark, not to change its meaning or destroy its utility. By notifying the public of the realities of postal operations; by offering a definition of the postmark embodied in regulation; and by listing out the various available indicia of postal possession, the present rulemaking seeks to clarify and preserve, rather than erode, the value of the postmark for customers who may rely upon it.

The above concerns may also reflect a view of the postmark fundamentally as a service that the Postal Service provides—one on par with, for example, reliable mail delivery and P.O. Box rentals. Indeed, multiple commenters characterize the postmark in just this way, describing it variously as an "essential benefit," a "public good," or a "service" that the Proposed Rule somehow threatens. This conception of the postmark possibly informs the demand, proclaimed in one frequently submitted form letter, that the postmark date and the date of first postal



Address:                    1111 BIRD CENTER
                           DRIVE
                           PALM SPRINGS
                           CA 92262
Location:                  PSPA
Device ID:                 -BTC02
Transaction:               940409026788

---

**FedEx Standard Overnight**
Tracking Number:
 396869661935        0.10 lb (S)              41.05
    Declared Value   100
Recipient Address:
    UNITED STATES DISTRICT CT
    1100 COMMERCE ST ROOM 1452
    Dallas, TX 75252
    0000000000

Scheduled Delivery Date 12/18/2025

Pricing option:
    ONE RATE

Package Information:
    FedEx Envelope

            Shipment subtotal:        $41.05

               Total Due:             $41.05

    M = Weight entered manually
    S = Weight read from scale
    T = Taxable item

Estimated Delivery Date 12/18/2025

Pricing option:
  ONE RATE

Package Information:
  FedEx Envelope

Shipment subtotal:          $41.05

Total Due:          $41.05

M = Weight entered manually
S = Weight read from scale
T = Taxable item

Terms and conditions apply, including terms that limit
FedEx's liability. The estimated shipping charge
may be different than the actual charges for your
shipment. Differences may occur based on actual weight,
dimensions and other factors. Shipment-related terms
and conditions and details on how shipping charges
are calculated are available upon request or at
fedex.com/serviceguide.

We value your feedback!
Tell us how we're doing!
fedex.com/fscfeedback

*** Thank you ***

Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

Dec 17, 2025 10:03:36 AM

AT&T Data Incident Settlement
c/o Kroll Settlement Administration LLC
P.O. Box 5324
New York, NY 10150-5324

Presorted
First Class Mail
U.S. Postage
PAID
Santa Ana, CA
Permit No. 949

**ELECTRONIC SERVICE REQUESTED**

### Notice of Proposed Settlement of Class Action

In Re: AT&T Inc. Customer Data Security
Breach Litigation
MDL Docket No. 3:24-md-03114-E

If you are a living person in the United
States whose Data Elements were
included in the AT&T 1 Data Incident,
announced on March 30, 2024, you are
eligible to receive Settlement Cash
Member Benefits from a class action
Settlement.

For more information, visit,
www.telecomdatasettlement.com

**CLASS MEMBER ID: 83231X4Y4CHN1**

**Postal Service: Please do not mark barcode**

68167A-2337198-P0047-T3323-B01-*******AUTO**5-DIGIT 92234
Jonathan King
39190 Channel Dr
Cathedral Cty, CA 92234-2214

---

Class Member ID: 83231X4Y4CHN1



VISIT THE SETTLEMENT WEBSITE BY
SCANNING THE PROVIDED QR CODE

### POSTCARD CLAIM FORM

To submit a claim for a Tier 1 Cash Payment or Tier 2 Cash Payment, please complete the below form, sign, and mail this portion of the postcard to the Settlement Administrator by no later than **December 18, 2025**. *Note*: Claims for Documented Loss Cash Payments require supporting documentation and therefore must be submitted online at **www.telecomdatasettlement.com** or mailed to the Settlement Administrator with a separate Claim Form.

Class Member ID: 83231X4Y4CHN1

Jonathan King
39190 Channel Dr
Cathedral Cty, CA 92234-2214

If different than the preprinted data on the left, please print your correct information.

First Name _____ MI ___ Last Name _____

Address _____

City _____ State ___ ZipCode ___

**Email Address:** _____ @ _____

### Pro Rata Cash Payment

☐ Yes, I choose a *pro rata* Cash Payment, instead of a Documented Loss Cash Payment, based on the Settlement Class I am in and wish to Claim the *pro rata* Cash Payment I am eligible for.

### SIGN AND DATE YOUR CLAIM FORM

I attest that the information supplied in this Claim Form by the undersigned is true and correct to the best of my recollection. I understand that I may be asked to provide supplemental information by the Settlement Administrator before my claim will be considered complete and valid.

Signature: _____ Print Name: _____ Dated (mm/dd/yy): ___ / ___ / ___

**DEADLINE TO RETURN**
**December 18, 2025.**

**What is this about?** On March 30, 2024, AT&T announced that AT&T-specific fields were contained in a data set released on the dark web ("AT&T 1 Data Incident"). Following AT&T's announcement of the AT&T 1 Data Incident, lawsuits were filed against AT&T in state and federal courts across the country. The lawsuits were consolidated before Judge Ada E. Brown in the Northern District of Texas in June 2024 (*In re AT&T Inc. Customer Data Sec. Breach Litigation*) (the "Action"). The Parties to the Action have agreed to enter a Settlement. Defendants do not acknowledge, admit to, or concede any of the allegations, and deny any fault or liability, or any charges of wrongdoing that have been or could have been asserted.

**Who is a Settlement Class Member?** You are an AT&T 1 Settlement Class member if you are a living person in the United States whose Data Elements were included in the AT&T 1 Data Incident that was announced on March 30, 2024.

**What are the benefits?** AT&T has agreed to make available a non-reversionary all cash fund of $149,000,000 to pay: (i) Settlement Administration Costs, (ii) Service Awards approved by the Court, (iii) any amounts approved by the Court for Attorneys' Fees and Costs, and (iv) applicable taxes, if any. All AT&T 1 Settlement Class Members may make a Claim for:

- **Documented Loss Cash Payment** – Each AT&T 1 Settlement Class Member can seek a payment for documented losses that occurred in 2019 or later of up to $5,000 per AT&T 1 Settlement Class Member, upon presentation of documented losses fairly traceable to the AT&T 1 Data Incident; OR
- **Cash Payment** – Instead of a Documented Loss Cash Payment, an AT&T 1 Settlement Class Member is eligible to make a Claim for a Tier 1 OR Tier 2 Cash Payment, which is a pro rata share of the AT&T 1 Net Settlement Fund, the amount of which depends upon which Tier you are in and the number of Valid Claims filed. For more information, visit the Settlement website **www.telecomdatasettlement.com**.

**How to make a claim?** To receive benefits from the Settlement, you must submit a Claim Form online at **www.telecomdatasettlement.com** by **December 18, 2025**, or by mail **postmarked by December 18, 2025**, and mailed to the Settlement Administrator's address below.

**What are my other rights?**
- <u>Do nothing</u>: If you do nothing, you remain in the Settlement. You give up your rights to sue, but you will not get any money or benefits; you must submit a Claim Form to get money or benefits.
- <u>Exclude yourself</u>: You can exclude yourself from the Settlement and keep your right to sue about the claims in these Actions, but you will not get any money from the Settlement. You must submit a request for exclusion to the Settlement Administrator by **November 17, 2025**.
- <u>Object</u>: You can stay in the Settlement but tell the Court why you think the Settlement should not be approved. Objections must be submitted by **November 17, 2025**. Detailed instructions on how to file a Claim Form, exclude yourself, or object are on the Settlement Website at **www.telecomdatasettlement.com**. The Court will hold the Final Approval Hearing on **January 15, 2026** at 9:00 a.m. to consider whether to approve the Settlement, hear objections, determine if the Settlement is fair, reasonable, and adequate, and consider Class Counsel's Application for Attorneys' Fees not to exceed one-third of the Settlement Funds, Costs, and Service Awards, not to exceed $1,500 per Class Representative. You may attend the hearing, but you don't have to.

***This is only a summary.*** For additional information, including a copy of the Settlement Agreement, Long-Form Notice, and other documents, or to update your address, visit **www.telecomdatasettlement.com** or call **(833) 890-4930**. You may also contact the Settlement Administrator at **AT&T Data Incident Settlement**, c/o Kroll Settlement Administration LLC, P.O. Box 5324, New York, NY 10150-5324.





NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

**BUSINESS REPLY MAIL**
FIRST-CLASS MAIL   PERMIT NO. 36777   PHILADELPHIA PA

POSTAGE WILL BE PAID BY ADDRESSEE

KROLL SETTLEMENT ADMINISTRATION LLC
PO BOX 5324
NEW YORK NY   10126-2877





Align top of FedEx® shipping label here.

RECEIVED

MAR 20 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

X-RAY

FedEx
Express

E

SHIP DATE: 19MAR26
ACTWGT: 0.20 LB
CAD: 699481B/SSFE2701

BILL CREDIT CARD

ORIGIN ID:PSPA (760) 774-2821
JONATHAN FLOYD KING

39190 CHANNEL DR
CATHEDRAL CITY, CA 92234
UNITED STATES US

TO US DISTRICT COURT
NORTHERN DIVISION
1100 COMMERCE ST STE 1452

DALLAS TX 75242
(760) 774-2821

FRI - 20 MAR 10:30A
PRIORITY OVERNIGHT

75242
TX-US DFW

TRK# 3997 7026 4083

XA KIPA

X-RAY